1  Paul Turcke, ISB #4759
   Cherese D. McLain, ISB #7911
2  MSBT Law
   950 W. Bannock Street, Suite 520
3  Boise, Idaho 83702
   Telephone: (208) 331-1800
4  Fax: (208) 331-1202
   pat@msbtlaw.com
5  cdm@msbtlaw.com

6  Lawson E. Fite (Ore. Bar #055573) *Pro Hac Vice*
   American Forest Resource Council
7  5100 S.W. Macadam, Suite 350
   Portland, Oregon 97239
8  Telephone: (503) 222-9505
   Fax: (503) 222-3255
9  lfite@amforest.org

10 Attorneys for Proposed Defendant-Intervenors

11              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF IDAHO

12 IDAHO RIVERS UNITED and FRIENDS OF        No. 3:16-cv-00102-CWD
   THE CLEARWATER,
13
                                             **OPPOSITION TO MOTION FOR**
14        Plaintiffs,                        **PRELIMINARY INJUNCTION [Dkt. 14] OF**
                                             **[PROPOSED] DEFENDANT-**
15        v.                                 **INTERVENORS IDAHO FOREST GROUP,**
                                             **LLC, AND R & R CONNER AVIATION,**
16 NEZ PERCE-CLEARWATER FOREST               **LLC**
   SUPERVISOR CHERYL F. PROBERT;
17 UNITED STATES FOREST SERVICE; NOAA
   FISHERIES; and U.S. FISH AND WILDLIFE
18 SERVICE,

19        Defendants,

20        and

21 IDAHO FOREST GROUP LLC, a Delaware
   limited liability company, and R&R CONNER
22 AVIATION LLC, a Montana limited liability
   company,
23
          Proposed Defendant-Intervenors.
24

25 [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
   PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................ 2

III.    LEGAL STANDARDS ................................................................................... 6

        A.  Plaintiffs must make a detailed showing, including demonstrating that they are
            likely to suffer irreparable harm absent an injunction ................................... 6

        B.  The merits standard is highly deferential ...................................................... 7

IV.     ARGUMENT ................................................................................................. 7

        A.  Plaintiffs have not shown they are likely to succeed on the merits.............................. 7

            1.  *IRU v. Hudson* is irrelevant ................................................................. 7

            2.  The 31 acres of harvest in the Wild and Scenic Corridor comply with WSRA ...... 8

            3.  The EIS adequately discusses sedimentation ........................................... 10

            4.  The Forest Service adequately considered cumulative impacts ........................ 12

            5.  There is no need for a supplemental EIS ................................................. 13

            6.  The Court lacks jurisdiction under the ESA ........................................... 14

            7.  The upward trend analysis is sufficient ................................................. 15

        B.  Plaintiffs will not suffer irreparable injury............................................... 15

        C.  The public interest and balance of harms weigh strongly against an  injunction........ 16

        D.  Environmental Organizations Are Not Exempt from the Bond Requirement ........... 18

V.      CONCLUSION .............................................................................................. 19

1

## <u>TABLE OF AUTHORITIES</u>

2
**Page(s)**

3
**Cases**

4
*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ........................................................................6

5
*Ctr. for Biological Diversity v. Hays,*
6
  No. 2:15-CV-01627-TLN-CMK, 2015 WL 5916739 (E.D. Cal. Oct. 8, 2015) ...............15, 17

7
*Earth Island Inst. v. Carlton,*
  626 F.3d 462 (9th Cir. 2010) ..................................................................11, 17

8
*Earth Island Inst. v. Gould,*
  No. 1:14-CV-01140-KJM-SKO, 2014 WL 4082021 (E.D. Cal. Aug. 19, 2014) ...................17
9

*Earth Island Inst. v. Quinn,*
10
  No. 2:14-CV-01723-GEB-EFB, 2014 WL 3842912 (E.D. Cal. July 31, 2014) ...................17

11
*Friends of the Wild Swan v. Christiansen,*
  955 F. Supp. 2d 1197 (D. Mont. 2013), *aff'd sub nom. Friends of the Wild*
12
  *Swan v. Weber,* 767 F.3d 936 (9th Cir. 2014) ...........................................17

13
*Granny Goose Foods, Inc. v. Brotherhood of Teamsters,*
  415 U.S. 423 (1974) ....................................................................................6
14

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
15
  607 F.3d 453 (7th Cir. 2010) ......................................................................19

16
*Idaho Rivers United v. Hudson,*
  No. 3:15-CV-169-BLW, 2016 WL 1222220 (D. Idaho Mar. 28, 2016), 2015
17
  WL 4170071 (D. Idaho July 10, 2015) ...................................................7, 8

18
*Idaho Wool Growers Ass'n v. Vilsack,*
  No. 14-35445, 2016 WL 805683 (9th Cir. Mar. 2, 2016)...........................12, 13, 15

19
*Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,*
  799 F.2d 547 (9th Cir. 1986) ........................................................................7
20

*Lands Council v. McNair,*
21
  537 F.3d 981 (9th Cir. 2008) (en banc) .................................................7, 12, 16

22
*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,*
  752 F.3d 755 (9th Cir. 2014) ......................................................................16
23

*Mazurek v. Armstrong,*
24
  520 U.S. 968 (1997)......................................................................................6

25
[PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - ii

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)............................................................................6, 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................7

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ...............................................................11

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) ........................................................12, 13

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004)...................................................................................9

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ...........................................................11, 12

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) ...............................................................19

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) .................................................................6

*Sierra Club v. United States*,
    23 F. Supp. 2d 1132 (N.D. Cal. 1998) ....................................................9

*Sports Form, Inc. v. United Press Int'l, Inc.*,
    686 F.2d 750 (9th Cir. 1982) .................................................................15

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .................................................................9

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
    143 F.3d 515 (9th Cir. 1998) .................................................................14

*United States v. Alameda Gateway Ltd.*,
    213 F.3d 1161 (9th Cir. 2000) ...............................................................14

*Wilderness Soc'y v. Tyrell*,
    918 F.2d 813 (9th Cir. 1990) .................................................................10

*Winter v. Natural Res. Defense Council*,
    555 U.S. 7 (2008)................................................................................6, 15

**Statutes**

5 U.S.C. § 706(2)(A)...................................................................................7

[PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - iii

16 U.S.C § 475 ................................................................................................18

16 U.S.C. §§ 1274(d), 1281(a), 1283(a) ...........................................................9

16 U.S.C. § 1540(g)(2)(A) ...............................................................................14

16 U.S.C. § 7301 ................................................................................................2

42 U.S.C. § 4331 (b)(5) ...................................................................................18

**Other Authorities**

36 C.F.R. § 218.11(b)(1) .................................................................................14

1   I.      INTRODUCTION

2           The Johnson Bar Fire Salvage Project has been carefully designed to help burned areas

3   recover from fire, reduce wildfire risk, and support communities in the region.  Proposed

4   intervenors Idaho Forest Group and R&R Conner are ready and willing to perform project work

5   to use low-impact harvest methods, and to use best management practices to ensure the

6   protection of the landscape.  A broad consensus has formed around the need for forest

7   restoration, a need this project will serve to address.

8           Plaintiffs' Motion for Preliminary Injunction is a misguided attempt to substitute

9   plaintiffs' judgment for that of the agency.  The Forest Service thoroughly considered and

10  evaluated all its legal obligations.  Under the Administrative Procedure Act (APA), its decisions

11  merit deference.  Plaintiffs have not demonstrated a sufficient chance of success on the merits to

12  justify the extraordinary remedy of a preliminary injunction.

13          Nor can plaintiffs make the essential showing of irreparable harm.  The harms they

14  allege, particularly tree cutting and sedimentation risk, range from speculative to nonexistent.

15  The project was designed to exclude areas with landslide potential, uses best management

16  practices to avoid sedimentation, and decommissions over 20 miles of roads.  All of the trees to

17  be cut are dead or dying, so their removal cannot be considered irreparable injury.

18          Instead, granting plaintiffs' Motion would lead to immediate and real injury.  It would

19  preclude reforestation of the areas to be treated by the project, where tree mortality is widespread

20  and risk of fire is high.  It would cause immediate and severe economic loss to the intervenors as

21  well as the rural communities and workers they and their contractors employ.  Because the

22  condition of dead wood deteriorates every day, further delay risks irreparable injury to the

23  resource.  If plaintiffs' Motion is granted, it is likely the project cannot be implemented, and the

24

25  [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
    PRELIMINARY INJUNCTION - 1

1    area will remain at extreme risk of further fires.  Timber receipts will not be available to restore

2    the broader landscape which is in great need of further work.

3            Plaintiffs will not succeed on the merits and cannot show irreparable harm.  The balance

4    of harms and public interest weigh strongly against an injunction.  Plaintiffs' Motion should be

5    denied.

6    **II.      BACKGROUND**

7            The Johnson Bar Fire burned over 13,000 acres of the Nez Perce-Clearwater National

8    Forest in the summer of 2014.  Decl. of William Higgins ¶ 7.  The fire resulted in very high tree

9    mortality due to pre-existing conditions, including pine beetle infestation, that increased the

10   susceptibility of the forest to catastrophic fire.  *Id.*  Over 6,000 acres burned at moderate or high

11   severity.  FS007677.  The widespread mortality was particularly significant in mixed

12   conifer/western redcedar-grand fir stands.  Prior to the fire, the Clearwater Basin Collaborative

13   (CBC), a group which brings together varied interests such as timber companies, local

14   governments, and environmental groups, worked together with the Forest Service to design

15   landscape treatments to restore the forest to health.  *Id.* ¶¶ 6-7.  The project area is part of a

16   landscape designated for restoration pursuant to the Collaborative Forest Landscape Restoration

17   Program (CFLRP), established to "encourage the collaborative, science-based ecosystem

18   restoration of priority forest landscapes. . . ."  16 U.S.C. § 7301.

19           Subsequent fires in summer 2015 emphasized the urgent need to treat this landscape to

20   reduce fuels and accelerate return of the full forest structure.  U.S. Forest Service, Johnson Bar

21   Fire Salvage Project Record of Decision, Feb. 17, 2016, at 7, 27 (ROD).  Without salvage, the

22   existing fuel condition is such that "resistance to control will remain high or above and increase

23   which may increase suppression costs and firefighter exposure."  FS007678.  In other words, the

24

25   [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
     PRELIMINARY INJUNCTION - 2

1   next fire is highly likely to burn out of control.  With treatment, the next fire will be smaller,

2   cooler, and controllable.  FS007679-80.

3        Although the Johnson Bar fire cut short the landscape work, the Forest Service used some

4   of the prior planning efforts to develop the Johnson Bar Fire Salvage Project to address

5   conditions caused by the fire.  FS001923; Higgins Decl. ¶¶ 16-17, 27.  The project is designed

6   with two complementary purposes.  It will salvage dead and dying timber before the timber loses

7   its economic value, providing for benefits to local communities.  FS001904.  It is also designed

8   to reduce potential sediment impacts into the aquatic ecosystem by using logging systems,

9   helicopter and skyline, with "minimal" impacts, and by decommissioning over 20 miles of road.

10  *Id.*; Higgins Decl. ¶ 12.

11       After reviewing the project, the collaborative group stated "salvage harvesting can

12  contribute to the restoration of the Project Area and produce an economic benefit to local

13  communities.  The harvest will provide the Forest Service an opportunity to reduce fuel loading,

14  and thereby help reduce the potential for future high severity wildfires."  FS002764.  When this

15  litigation was filed, the CBC wrote, "A delay in the 2016 and/or 2017 timber sales would cause

16  significant and irreparable harm to the merchantability of timber resources in the Johnson Bar

17  Fire Salvage Project area . . . ."  Higgins Ex. A at 3.  The CBC expressed its "concern[] that a

18  delay resulting in the loss of another field season is certain to reduce timber receipts available to

19  contribute to reforestation and other restoration activities and could result in the abandonment of

20  the Project if timber deteriorates to the point where it is not economically viable to commercially

21  harvest."  *Id.* at 3-4.

22       Since the fire burned unevenly across the landscape, the project has been designed to

23  follow fire severity.  Every salvage unit experienced at least 60% mortality, with many over

24

25  [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
    PRELIMINARY INJUNCTION - 3

90%.  FS001950-52.  The harvest will be followed by replanting across all the harvested acres.

This replanting will accelerate the return of the area to the appropriate mix of native species.

FS001924.  Replanting would not be possible without the salvage harvest.  FS001924.

      The project is designed to minimize short-term disturbance to the landscape.  First, over

90% of the harvest is with light impact techniques such as skyline and helicopter.  Higgins Decl.

¶¶ 11-12; FS001903.  From experience, helicopter logging, in particular, is "exceptionally light

on the land."  Decl. of Ryan Conner ¶ 6.  The project excludes harvest in landslide prone areas,

FS001908, and no ground-based skidding is allowed on slopes over 35%.  *Id.*  Coarse woody

material will be retained, as will snags for wildlife use.  FS001908.  No old growth will be

harvested.  FS001910.  Roads to be used for hauling timber will be reconditioned and maintained

to reduce potential sediment.  Higgins Decl. ¶¶ 12-13.  The operators will use best management

practices to control erosion risk.  *Id.* ¶ 13; FS001912.

      During project development, the Forest Service considered comments from interested

parties about the impacts, economic viability, and design of the project.  The preferred

alternative was designed in response to those comments, ultimately designing a final project that

was economically viable and avoided work in Wild and Scenic River corridors.  U.S. Forest

Service, Final Environmental Impact Statement, Johnson Bar Fire Salvage Project, at 1, January

2016 (FEIS).  The Forest Supervisor's ultimate decision further addressed these comments,

eliminating 261 acres of harvest, including almost a half-mile of road construction and four

helicopter landings, and "drastically reducing" harvest within the Wild and Scenic River

Corridor.  FS001925.  Only 31 acres of harvest will occur in the corridor on areas where

treatment is needed for public safety and fuel reduction purposes.  FS001939.  The final decision

also removes actions hydrologically connected to the Selway River.  FS001924.

[PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 4

1    The project was carefully designed to take scenic and ecosystem values into account.  It

2    includes feathered edge treatments that will "emulate natural openings in areas visible from

3    critical view points and travel corridors" and "emulate natural edge patterns."  FS001916.  The

4    project will use techniques such as variable retention harvest.  *See* FS018356 (example of

5    variable retention).  Although plaintiffs repeatedly call the project a "clearcut," it is not a

6    clearcut.  All units, at minimum, contain reserves.  FS001951-52.  The units are spaced

7    throughout a wide project area.  FS001949.  Only dead or dying trees will be harvested.

8    FS007751-53.  If a tree is likely to survive, it will be left unharvested after careful examination.

9    FS007752.   Large snags will be left standing for the benefit of wildlife.  FS001910.

10    The Forest Service worked hard to build broad-based support for this project.  For

11    example, the Forest Service carefully considered, and responded to, the CBC's comments about

12    the design of the project.  The Forest Service attempted to collaborate with the plaintiffs.

13    FS001585.  This was apparently to no avail.  Plaintiffs delayed implementation of the project by

14    filing a nearly 100-page objection in November 2015.  Dkt. 1, Compl. ¶ 55.  The final Record of

15    Decision was issued February 17, 2016.  Compl. ¶ 59; FS001943.

16    Plaintiffs filed suit on March 11.  Compl. at 36.  They bring seven claims for relief,

17    asserting violations of the Wild and Scenic Rivers Act (WSRA), *id.* ¶¶ 87-100; National Forest

18    Management Act (NFMA), *id.* ¶¶ 101-06, 128-32; National Environmental Policy Act (NEPA),

19    *id.* ¶¶ 106-27; and Endangered Species Act (ESA), *id.* ¶¶ 133-39.  Plaintiffs then moved to

20    preliminary enjoin the project on April 6.  Dkt. 14.  Plaintiffs' Motion focuses on their First and

21    Second Claims for Relief under WSRA, their Fourth and Fifth Claims under NEPA, and the

22    Third and Sixth Claims under NFMA.  Pls.' Br. at 12-21.

23

24

25    [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## III.    LEGAL STANDARDS

### A.    Plaintiffs must make a detailed showing, including demonstrating that they are likely to suffer irreparable harm absent an injunction.

The standard for granting a preliminary injunction imposes the burden on a plaintiff to demonstrate by a clear showing that it is entitled to the extraordinary remedy of a preliminary injunction.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To obtain a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of a preliminary injunction, that the balance of harm tips in its favor, and that an injunction is in the public interest.  *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008).  A plaintiff, as the party seeking injunctive relief, bears the burden of demonstrating each factor justifying relief by clear and convincing evidence.  *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441 (1974).  If a plaintiff can only show that there are serious questions going to the merits, the plaintiff must still demonstrate that irreparable harm is likely and must show the balance of harms tips sharply in a plaintiff's favor and an injunction is in the public interest.  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

Under either approach, plaintiffs must show that irreparable harm is likely in order to be granted an injunction.  "*Winter* tells us that plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The Supreme Court's 7-1 decision in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), emphasized the need to demonstrate irreparable harm.  *Monsanto* rejected a line of Ninth Circuit authority which "appear[ed] to presume that an injunction is the proper remedy for a NEPA violation . . .." 561 U.S. at 157.

[PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 6

1    At the preliminary injunction stage, the court is not obligated to resolve conflicting

2   factual issues, much less to resolve such conflict in plaintiff's favor.  "In deciding a motion for a

3   preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions

4   of law or disputed questions of fact.'"  *Int'l Molders' & Allied Workers' Local Union No. 164 v.*

5   *Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (citation omitted).

6       **B.    The merits standard is highly deferential.**

7       The Court should also consider that in evaluating the likelihood of success on the merits,

8   the deferential arbitrary and capricious standard of review under the Administrative Procedure

9   Act applies.  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc); 5 U.S.C. §

10  706(2)(A).  Under this narrow standard of review, a court may not substitute its judgment for that

11  of the agency.  *McNair*, 537 F.3d at 987.  Rather, an agency may only be reversed as arbitrary

12  and capricious "if the agency relied on factors Congress did not intend it to consider, entirely

13  failed to consider an important aspect of the problem, or offered an explanation that runs counter

14  to the evidence before the agency or is so implausible that it could not be ascribed to a difference

15  in view or the product of agency expertise."  *Id.* (internal citation omitted); *Motor Vehicle Mfrs.*

16  *Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

17  **IV.    ARGUMENT**

18      **A.    Plaintiffs have not shown they are likely to succeed on the merits.**

19          **1.    *IRU v. Hudson* is irrelevant.**

20      Plaintiffs make much of the decisions of Chief Judge Winmill in *Idaho Rivers United v.*

21  *Hudson*, No. 3:15-CV-169-BLW, 2016 WL 1222220 (D. Idaho Mar. 28, 2016), 2015 WL

22  4170071 (D. Idaho July 10, 2015), implying that *Hudson* somehow determined some of the

23  issues present here.  It did not.  *Hudson* is simply beside the point in considering the merits, or

24

25  [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
    PRELIMINARY INJUNCTION - 7

1  lack thereof, of plaintiffs' Motion.

2  *Hudson* involved two points that are inapplicable here.  First, the court determined that

3  the Forest Service failed to consider its Wild & Scenic Rivers Act duties at all when making the

4  decision in question.  2016 WL 1222220 at *4.  Here, by contrast, the Forest Service not only

5  considered WSRA values and duties, it acted on them.  The EIS and ROD describe measures to

6  be taken to meet visual quality objectives.  FS001311-12, 001915-16.  Although the vast

7  majority of the project area is outside the designated corridor, FS018452, the EIS contains an

8  extensive discussion of effects of the alternatives on Wild and Scenic Rivers.  FS001505-18.

9  This details how the project complies with all standards for management of Wild and Scenic

10  corridors and adjacent areas.  FS001507-15.  The Forest Service relied on a highly detailed

11  specialist report.  FS018433-47.  The Forest Service ultimately concluded, as to these resources,

12  "In most cases the project would have no effect or no adverse effect."  FS001507.  The ROD

13  went a step further, responding to public concern by "drastically reducing the amount of

14  harvesting within the Wild and Scenic Corridor."  FS001925.

15  Thus, while the proposed action (Alternative 2) would have harvested 185 acres within

16  the Wild & Scenic Corridor, FS001507, the ultimate decision reduced that to 31 acres.

17  FS001903.  All 31 acres of treatment were determined to be necessary for public safety and to

18  address risk of fire to adjacent land.  FS001934.

19  The second issue in *Hudson* was the existence of a Regional Forester's order barring

20  commercial hauling on the road in question.  2016 WL 1222220 at *4.  The court held the Forest

21  Service "entirely failed" to consider this order.  There is no comparable deficiency here.

22  **2.  The 31 acres of harvest in the Wild and Scenic Corridor comply with WSRA.**

23  The Decision Record states that the project will salvage harvest 31 acres in the Wild and

1   Scenic River Corridor.  FS001934.  These acres were included "due to the fact that dead trees are

2   falling onto the road resulting in public safety concerns and the acreage is adjacent to private

3   property.  In order to prevent future safety concerns, these acres are being included in this

4   decision." FS001903. "The areas proposed for treatment are for public safety purposes and fuel

5   reduction adjacent to private lands."  FS001939.  This represents less than 1.5% of the 2,104-

6   acre harvest area and 0.1% of the project area.  FS001903.

7            Plaintiffs claim this still violates sections 3(d), 10(a), and 12(a) of WSRA, 16 U.S.C. §§

8   1274(d), 1281(a), 1283(a).  The section 3 claim alleges that the existing River Plan for the

9   Selway and Middle Fork of the Clearwater Rivers is overdue for revision.  Pls.' Br. at 17-18.

10  Even assuming *arguendo* that plaintiffs are correct that the plan is overdue for an update, the

11  staleness of the plan does not allow an injunction of this project.  There is no statutory provision

12  that requires a river plan before necessary restoration work may proceed.  Injunctions must be

13  narrowly "tailored to remedy the specific harm alleged."  *Stormans, Inc. v. Selecky*, 586 F.3d

14  1109, 1119 (9th Cir. 2009).  In *Sierra Club v. United States*, 23 F. Supp. 2d 1132, 1137 (N.D.

15  Cal. 1998), the court held that section 3(a) "does not, on its own, grant the Court authority to

16  enjoin [the agency]'s land management activities in the area."  Thus a reviewing court "may not

17  enjoin or set aside [timber] sales based upon the failure to prepare the [River] Plans."  *Id.* at 1138

18  (quoting *Newton Cnty. Wildlife Ass'n v. USFS*, 113 F.3d 110, 112 (8th Cir. 1997)).  To the extent

19  the River Plan needs to be updated, there are other remedies available that can be addressed at

20  the merits stage of this case.

21           As to sections 10(a) and 12(a), plaintiffs argue that the project is not consistent with the

22  broad statutory purposes of WSRA.  It is unclear whether these purposes are enforceable in light

23  of *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004).  The Forest Service

24

25  [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
    PRELIMINARY INJUNCTION - 9

1    unquestionably fulfilled its duty to coordinate with the Secretary of the Interior, unlike the

2    situation in *Wilderness Soc'y v. Tyrell*, 918 F.2d 813, 820 (9th Cir. 1990), where the sale was

3    opposed by other agencies.  The Forest Service gave its WSRA duties full and adequate

4    consideration, including modifying the project to drastically reduce harvest in the WSRA

5    corridor.  It designed the project to protect visual and aquatic resources and adequately balanced

6    its land management obligations.

7             The project also complies with the River Plan as incorporated into the Nez Perce Forest

8    plan.  FS018861.  The River Plan unambiguously allows harvest in the wild and scenic corridor

9    for public safety purposes, and for fuel control purposes.  FS032122.  The EIS states that these

10   standards are met as there is "potential for reburn if no action is taken."  FS001509.  The Forest

11   Supervisor explicitly found the 31 acres were necessary for public safety and fire control.

12   FS001939.  In light of the scientific evidence of fire risk, these conclusions were reasonable and

13   supported by the record.

14                     **3.    The EIS adequately discusses sedimentation.**

15            Plaintiffs claim that the EIS underestimated or "misrepresented" sedimentation risk from

16   the project.  Pls.' Br. at 15-16.  This claim is not supported by the record.

17            The FEIS found the "project presents an opportunity to reduce hillslope erosion below

18   the existing conditions present in many of treatment units."  FS001355.  The project does this by

19   scattering fine woody debris—obtained from the salvage harvest—on treatment unit hillsides.

20   FS001355.  This requirement "specifically addresses erosion concerns."  FS001355.  The Forest

21   Service's expert hydrologist accordingly concluded that the project would decrease risk of a

22   major runoff event by almost 50% throughout the project area.  FS001356.  Moreover, the Forest

23   Service analyzed landslide risk of the area and deleted all harvest in landslide-prone areas.

24

25   [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
     PRELIMINARY INJUNCTION - 10

1    FS001282.  Each landslide-prone area will receive a buffer.  FS001303.

2         Plaintiffs deride this analysis, claiming that the Forest Service ignored past landslides.

3    Pls.' Br. at 14.  Their claims are wrong.  The Forest Service specifically refers to past landslide

4    location in locating risky areas.  FS001303.  Its soils specialist relied on detailed mapping of the

5    project area, conducted in 2006, to analyze landslide risks.  FS017622-24.  And the FEIS

6    includes past landsides, in 1995/96, in its cumulative effects analysis.  FS001319.  These are the

7    same landslides plaintiffs claim were ignored.  Macfarlane Decl. ¶ 14, Ex. 2.  Notably, the

8    1995/1996 events were associated with extraordinary weather conditions that occurred during

9    that winter, conditions that are not currently present.  Macfarlane Ex. 2 at 10-11, Dkt. 14-11 at

10   20-21.

11        Plaintiffs' critique is faulty at a threshold level.  Plaintiffs seek this Court's evaluation of

12   a "battle of the experts" and a determination that plaintiffs' experts are better.  The law does not

13   allow such weighing of the scientific evidence.  Instead, "[w]hen specialists express conflicting

14   views, an agency must have discretion to rely on the reasonable opinions of its own qualified

15   experts even if, as an original matter, a court might find contrary views more persuasive." *San*

16   *Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603-04 (9th Cir. 2014).

17   Accordingly, federal agencies "have broad discretion in choosing how to respond to opposing

18   scientific evidence." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 472 (9th Cir. 2010).

19        A court should not "act as a panel of scientists that instructs the [agency]" or "chooses

20   among scientific studies. . . ." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d

21   1067, 1075 (9th Cir. 2011) (quoting *McNair*, 537 F.3d at 988).  As such, the Court should reject

22   plaintiffs' claims that the Forest Service should have used the GRAIP analytical tool instead of

23   NEZSED or WEPP.  *See* Pls.' Br. at 14.  The choice of studies or models is up to the agency.

24

25   [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
     PRELIMINARY INJUNCTION - 11

1  "The Forest Service is owed greater-than-average deference as it relates to its choice of technical

2  methodologies." *Idaho Wool Growers Ass'n v. Vilsack*, No. 14-35445, 2016 WL 805683, at *10

3  (9th Cir. Mar. 2, 2016).  To be sure, at times in the past, "jurisprudence at times has shifted away

4  from the appropriate standard of review. . . ." *McNair*, 537 F.3d at 988.  But to return to the past

5  jurisprudence would be a mistake.

6          In *Jewell*, the Ninth Circuit held it was an abuse of discretion for the district court to

7  invite expert comment from the plaintiffs and then use that expert comment as a reason for

8  rejecting the agency action.  747 F.3d at 604.  It is inappropriate, the court has long held, to use

9  technical testimony "for the purpose of determining the scientific merit of the [agency]'s

10  decision." *Id.* (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1161 (9th Cir. 1980)).  Therefore,

11  plaintiffs' expert testimony should not be relied on by the Court in determining whether the

12  Forest Service adequately evaluated sedimentation risk.

13          Moreover, plaintiffs' criticisms of the EIS come down to speculation.  Plaintiffs' witness

14  is only able to say, "This error results in what *may be* a gross underestimate of fire-related

15  sedimentation to the rivers and streams in the Johnson Bar FEIS and ROD."  Pierce Decl. ¶ 22

16  (emphasis added).  Dr. Pierce also lends support to the urgent need for fire prevention.  She

17  states, "it is reasonable to assume that fire activity (and related sedimentation events), will

18  continue to increase in Idaho, including the Clearwater area." *Id.*

19                      **4.      The Forest Service adequately considered cumulative impacts.**

20          Plaintiffs claim that the Forest Service did not adequately consider cumulative impacts of

21  past and present salvage logging in the area.  Pls.' Br. at 16.  Again, plaintiffs misread the record.

22  NEPA requires only that where "several actions have a cumulative ... environmental effect, this

23  consequence must be considered in an EIS." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,

24

25  [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
   PRELIMINARY INJUNCTION - 12

1   137 F.3d 1372, 1378 (9th Cir. 1998) (quoting *City of Tenakee Springs v. Clough*, 915 F.2d 1308,

2   1312 (9th Cir. 1990)).  The EIS considers federal, private and state salvage harvest in the area,

3   past and present.  FS001319-20, 001364, 001393-94 (detailing effects of state and private

4   salvage on fisheries resources).  It then deploys these activities throughout every component of

5   its analysis.  FS001328-29, 001338, 001360-85, 001391-95, 001406-07, 001413, 001429-30,

6   001446-50 (soils analysis considering cumulative effects of all timber harvest from the 1950s to

7   20-50 years into the future), 001480-84, 001498-001500, 001504-05, 001518, 001533-34,

8   001537, 001540-41, 001544-45, 001548-50, 001552-53, 001556-57, 001559-60, 001564-65,

9   001572-74, 001575-76, 001578-79, 001582-83.  Directly contrary to plaintiffs' contention, the

10  Forest Service considered cumulative effects on the Wild and Scenic River Corridor, noting

11  "there has been a cadence of short-term activities occurring in the corridor that could be

12  perceived as industrial intrusion within the otherwise pastoral environment. . . ."  FS001518.

13  The Forest Service took a hard look at cumulative effects.

**5.    There is no need for a supplemental EIS.**

15  Plaintiffs allege a supplemental FEIS is needed.  Pls.' Br. at 12-13.  Plaintiffs are wrong.

16  "Supplementation is not required where the agency, having taken a 'hard look' at reevaluation,

17  'determines that the new impacts will not be ... significantly different from those already

18  considered.'"  *Idaho Wool Growers*, 2016 WL 805683, at *8 (quoting *N. Idaho Cmty. Action

19  Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154-55 (9th Cir. 2008)).  Plaintiffs

20  specifically challenge the Forest Service's response to the 2015 fires.  The Forest Service

21  prepared a memorandum detailing the effects of each fire.  FS000662-68.  In that memorandum,

22  the Forest Service inquired whether there was any change to each resource indicator considered

23  in the EIS.  FS000663-68.  Virtually none of these indicators changed.  The Forest Service noted

24

25  [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 13

1    and considered the changes to sediment yield in the larger basin watersheds, but concluded there

2    would be no change within the project area.  FS000665, 000668.  As such, the agency took a

3    "hard look" at its reevaluation and appropriately determined a supplement was not needed.

4        Plaintiffs imply that changes to the EIS after the objection resolution meeting were

5    somehow improper.  Pls.' Br. at 13.  To the contrary, the changes are called for both in the

6    instructions from the objection reviewing officer, FS032984, but also in Forest Service

7    regulations.  36 C.F.R. § 218.11(b)(1).  ("A written response must set forth the reasons for the

8    response, but need not be a point-by-point response and may contain instructions to the

9    responsible official").  The agency acted within its discretion and applicable procedural

10   guidance.

11              **6.        The Court lacks jurisdiction under the ESA.**

12       In a footnote, plaintiffs claim that injunctive relief is appropriate on their claims against

13   the biological opinions obtained by the Forest Service under the Endangered Species Act

14   consultation process.  Pls.' Br. at 21 n.6.  They go on to argue that harm to listed species justifies

15   an injunction.  *Id.* at 23-24.  Plaintiffs' failure to present the merits of any ESA claim, or to cite

16   any authority, means the claim is waived for purposes of this Motion.  *United States v. Alameda*

17   *Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000).

18       Plaintiffs' ESA claims are not against the Forest Service but only challenge the biological

19   opinions issued by NOAA and the Fish and Wildlife Service.  Compl. ¶¶ 133-139.  For plaintiffs

20   to bring an ESA claim against the Forest Service, they were required to give pre-suit notice by

21   section 11(g)(2)(A) of the ESA, 16 U.S.C. § 1540(g)(2)(A).  This requirement is jurisdictional

22   and is not subject to tolling or waiver.  *Sw. Ctr. for Biological Diversity v. U.S. Bureau of*

23   *Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998).  Accordingly, there is no jurisdiction to issue

24

25   [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
     PRELIMINARY INJUNCTION - 14

1    injunctive relief against the Forest Service under the ESA.

2                    **7.    The upward trend analysis is sufficient.**

3           Plaintiffs allege the Forest Service did not correctly find an upward trend in degraded

4    watersheds, in violation of the Forest Plan.  Pls.' Br. at 21.  Plaintiffs attack is without basis.  The

5    Forest Service reviewed, in detail, the watershed management indicators and concluded that an

6    upward trend would remain for two reasons: (1) the project is designed to prevent erosive

7    impact; and (2) the project involves decommissioning of over 20 miles of roads.  FS001666-67.

8    This is reasonable and supported by the record.  Plaintiffs' attempt to challenge the Forest

9    Service's choice of model fails under *Idaho Wool Growers*, *supra*.

10          **B.    Plaintiffs will not suffer irreparable injury.**

11          Because plaintiffs will not succeed on the merits, there is no need for the Court to analyze

12   the remaining factors of the test for injunctive relief.  *See Sports Form, Inc. v. United Press Int'l,*

13   *Inc.*, 686 F.2d 750, 753 (9th Cir. 1982) (stating that any injunctive relief analysis comes to an

14   end where the movant has no chance of success on the merits).  Plaintiffs have failed to show

15   that irreparable harm is *likely* rather than merely *possible*.  *Winter*, 555 U.S. at 22.

16          Plaintiffs claim that the salvage harvest constitutes irreparable injury *per se*.  Pls.' Br. at

17   22-23.  Regardless of whether the cases cited are still viable after *Winter* and *Monsanto*, they are

18   inapplicable in the salvage context, as one District Court has recognized.  "Unlike [] green

19   timber . . ., fire-killed trees are in a process of deterioration that, over time, will result in them

20   breaking and falling over."  *Ctr. for Biological Diversity v. Hays*, No. 2:15-CV-01627-TLN-

21   CMK, 2015 WL 5916739, at *11 (E.D. Cal. Oct. 8, 2015).  Thus, *Hays* held that the cutting of

22   salvage timber did not constitute, in itself, irreparable injury.  *Id.*

23          Plaintiffs' irreparable harm argument exaggerates the nature and extent of the modest

24

25   [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
     PRELIMINARY INJUNCTION - 15

1   timber salvage authorized by the Johnson Bar Project.  In fact, the project retains a significant

2   amount of burned forest habitat – over 92% of the project area will go untreated – and provides

3   large areas of suitable habitat for wildlife species and will continue to provide forest services.

4        Plaintiffs further claim that sedimentation risk and effects to visual resources will cause

5   irreparable harm.  Pls.' Br. at 23-24.  The sedimentation claims, as shown above, are at most

6   speculative.  The project is designed to minimize erosion risk.  Intervenors will use light harvest

7   methods.  The Forest Service has also designed the project to minimize scenic impacts.   The

8   most pressing threat of irreparable injury is to the degrading wood.  Higgins Ex. A at 4.  If the

9   project is delayed, needed restoration work will be threatened and there is a heightened risk of

10   severe wildfire.

11        **C.**     **The public interest and balance of harms weigh strongly against an injunction.**

12        The actual harm to defendant-intervenors, Federal defendants, and others interested in

13   active and effective forest management far outweighs the speculative harm to plaintiffs and it is

14   in the public interest to continue with the limited salvage of completely dead trees designed to

15   prevent irreparable loss of lumber value, support jobs in rural Idaho County, and reduce the fuel

16   load to avoid the loss of still more forested wildlife habitat.  Here, both "economic and

17   environmental interests are relevant factors, and both carry weight in this analysis." *League of*

18   *Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th

19   Cir. 2014).  Mitigating fire and disease risks "is a valid public interest." *Id.* at 766.  The en banc

20   Ninth Circuit emphasized, "Our law does not ... allow [the Court] to abandon a balance of the

21   harms analysis just because a[n] ... environmental injury is at issue." *McNair*, 537 F.3d at 1005.

22        In salvage cases, courts in the Ninth Circuit have recognized that the balance of harms

23   and public interest will often weigh in favor of project implementation. *Earth Island Inst. v.*

24

25   [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION - 16

1    *Carlton*, 626 F.3d 462, 476 (9th Cir. 2010), affirmed the district court's finding that salvage

2    logging was necessary to promote forest regeneration.  In *Earth Island Inst. v. Gould*, No. 1:14-

3    CV-01140-KJM-SKO, 2014 WL 4082021, at *8 (E.D. Cal. Aug. 19, 2014), the court reviewed

4    evidence that "time is of the essence given the daily deterioration of timber" and "the limited

5    period of time left in which to conduct timber operations."  And the court in *Earth Island Inst. v.*

6    *Quinn*, No. 2:14-CV-01723-GEB-EFB, 2014 WL 3842912, at *8 (E.D. Cal. July 31, 2014), also

7    found that the balance of harms and public interest weighed in favor of the project:

8            [B]ecause of timber deterioration rates and the approaching close of the
9            harvesting season in December 2014, a delay in commencing the Big Hope
             Project, even until October 2014, jeopardizes the entire project.  Thus, Bamford
10           and Defendants' economic losses, as well as the loss of approximately 1,000 jobs
             locally, would be permanent, not temporary.  Further, without realizing the profit
11           from the salvage harvest, the Forest Service would be unable to remove the
             hazard trees threatening public health and safety.

12   *See also Hays,* 2015 WL 5916739, at *12 (holding that "public safety concerns" from risk of fire

13   "alone outweigh Plaintiffs' questionable injuries from the loss of a small fraction of burned

14   forest on the Project"); *Friends of the Wild Swan v. Christiansen*, 955 F. Supp. 2d 1197, 1203

15   (D. Mont. 2013), *aff'd sub nom. Friends of the Wild Swan v. Weber*, 767 F.3d 936 (9th Cir. 2014)

16   (recognizing that salvage project "will reduce both the likelihood and severity of forest fires in

17   the area" and denying request for injunction).

18           Here, the same set of concerns exist.  Delay of the sales risks irreparable harm to the

19   resource and to proposed intervenors.  Higgins Decl. ¶¶ 17-18; Conner Decl. ¶ 11.  Particularly,

20   the operating window is likely to close in October 2016, and harvest in 2017 is not viable

21   because the wood will no longer have value.  Higgins Decl. ¶ 18; Conner Decl. ¶ 11.  There is an

22   urgent need to get this wood out while it still retains value and before the forest suffers a

23   catastrophic reburn.  Intervenors are depending on the project to provide substantial amounts of

24

25   [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
     PRELIMINARY INJUNCTION - 17

1    timber and to provide employment for loggers, loaders, pilots, road workers, mill workers, and

2    truckers.   Higgins Decl. ¶¶ 4-5, 10-11, 14-15, 17-21, 27; Conner Decl. ¶¶ 5, 7-8, 13-14.   The

3    project is an important component of continued employment at IFG's Grangeville sawmill,

4    where many logs will be processed.  Higgins Decl. ¶ 4.  The volume represents half of R&R's

5    company's helicopter work for the year.  *Id.* ¶ 6.  R&R is a small business which employs 37

6    people at family-wage jobs.  *Id.*  ¶ 4.

7            Denying an injunction is consistent with the public interest in maintaining a healthy

8    forest, allowing for timber receipts to fund further restoration work, and preventing future

9    wildfire.  It is also consistent with the public interest in maintaining employment and social

10   stability in and around Idaho County.  This kind of action is what Congress envisioned when

11   enacting the Collaborative Forest Landscape Restoration Act.  Congress has also expressed the

12   public interest by directing that National Forests "furnish a continuous supply of timber for the

13   use and necessities of citizens of the United States."  16 U.S.C § 475.  Moreover, NEPA's

14   purposes include to "achieve a balance between population and resource use which will permit

15   high standards of living and a wide sharing of life's amenities."  42 U.S.C. § 4331 (b)(5).

16           The public interest is served by a forest that works for everyone, not just a select group.

17   By advancing forest restoration and community stability, this project does just that.

18           D.      **Environmental Organizations Are Not Exempt from the Bond Requirement.**

19           The above discussion demonstrates that plaintiffs are not entitled to the extraordinary

20   remedy of an injunction.  Still, intervenors write briefly on the issue of the bond requirement to

21   point out that it applies to for-profit and not-for-profit entities alike.

22           Federal Rule of Civil Procedure (FRCP) 65(c) states that a court "may issue a preliminary

23   injunction . . . only if the movant gives security in an amount that the court considers proper to

24   pay the costs and damages sustained by any party found to have been wrongfully enjoined or

25   [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
     PRELIMINARY INJUNCTION - 18

restrained."  Although the Ninth Circuit has upheld the imposition of "nominal bonds in public interest cases," it also has emphasized that "each case is fact-specific."  *Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1126 (9th Cir. 2005).  Further, where "a district court does not set such a high bond that it serves to thwart citizen actions, it does not abuse its discretion."  *Id.* (affirming imposition of $50,000 bond against environmental organization).

The Seventh Circuit in 2010 addressed the bond requirement in the context of a case involving a challenge to a Forest Service timber sale brought by "a nonprofit enterprise dedicated to promoting environmental quality."  *Habitat Educ. Ctr. v. U.S. Forest Serv.,* 607 F.3d 453, 455 (7th Cir. 2010).  Writing for the court, Judge Posner held that environmental nonprofits are not exempt from the bond requirement of FRCP 65(c).  *Id.* at 457 ("We are not persuaded . . . that nonprofit entities, at least those devoted to . . . protection of the environment, should be exempted from having to post injunction bonds.").

Although plaintiffs are not entitled to an injunction, if the Court were to entertain such a notion, at the very least plaintiffs should be required to fully inform the Court with documentation as to their financial capability to post a bond so that it can be held responsible for the harm that would flow from its requested injunction of the beneficial Johnson Bar Fire Salvage project.

## V.  CONCLUSION

The Court should deny the Motion for Preliminary Injunction.

Respectfully submitted this 19th day of April, 2016.

/s/ Paul Turcke
Paul Turcke, ISB #4759
Cherese D. McLain, ISB #7911
MSBT Law
950 W. Bannock Street, Suite 520
Boise, Idaho 83702
Telephone: (208) 331-1800
Fax: (208) 331-1202
pat@msbtlaw.com

[PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION - 19

/s/ Lawson E. Fite
Lawson E. Fite (Ore. Bar #055573)
*Pro Hac Vice*
American Forest Resource Council
5100 S.W. Macadam, Suite 350
Portland, Oregon 97239
Telephone: (503) 222-9505
Fax: (503) 222-3255
lfite@amforest.org

Attorneys for Proposed Defendant-Intervenors

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on the 19th day of April 2016, I filed the foregoing document

3   electronically through the CM/ECF system, which caused the following parties or counsel to be

4   served by electronic means, as more fully reflected on the Notice of Electronic Filing.

5   Deborah A. Ferguson          daf@fergusondurham.com
    Laurence J. Lucas            llucas@advocateswest.org
6   Marc A. Shumaker             mshumaker@advocateswest.org
    Julia Sharon Thrower         julie.thrower@usdoj.gov
7   Sean C. Duffy                sean.c.duffy@usdoj.gov

8

9                               /s/ Paul Turcke
                                Paul Turcke

10                              /s/ Lawson E. Fite
                                Lawson E. Fite
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  [PROPOSED] DEFENDANT-INTERVENORS' OPPOSITION TO MOTION FOR
    PRELIMINARY INJUNCTION - 21