JOHN C. CRUDEN,
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

JULIA S. THROWER (CA Bar No. 253472)
Trial Attorney
Natural Resources Section
301 Howard Street, Suite 1050
San Francisco, CA  94105
t: 415/744.6566; f: 415/744-6476
e: julie.thrower@usdoj.gov

RICKEY D. TURNER (CO Bar No. 38353)
Trial Attorney
Wildlife and Marine Resources Section
999 18th Street, Suite 370 – South Terrance
Denver, CO 80202
t: 303/ 844-1373; f: 303/844-1350
e: rickey.turner@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO RIVERS UNITED and FRIENDS OF THE CLEARWATER, <br><br> Plaintiffs, <br><br> v. <br><br> NEZ PERCE-CLEARWATER FOREST SUPERVISOR CHERYL F. PROBERT, *et al.*, <br><br> Defendants. | Case No. 3:16-cv-102-CWD <br><br><br> **FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [ECF No. 14]** |

## I.     INTRODUCTION AND FACTUAL BACKGROUND[1]

In February 2016, after nearly two years of extensive environmental analysis and public review of a detailed 597-page final environmental impact statement (FEIS), the U.S. Forest Service (Forest Service) approved the Johnson Bar Fire Salvage Project (Project). The Project seeks to restore the area with fire resilient tree species and to reduce road-related sediment impacts to aquatic species and the watershed. To offset the high expense of these improvement efforts and to provide a benefit to the local communities, the Project seeks to recover the economic value from the burned timber in Project area. On-the-ground activities are scheduled to begin on May 15, 2016.

Plaintiffs now seek a preliminary injunction to halt the Project and its benefits to the environment and the local communities. ECF No. 14-1 (Pls.' Mot.). Plaintiffs assert that, in approving the Project, Federal Defendants, the Forest Service, the National Marine Fisheries Service (NMFS), and the U.S. Fish & Wildlife Service (FWS), violated the National Environmental Policy Act (NEPA), the Wild and Scenic Rivers Act (WSR Act), the National Forest Management Act (NFMA), the Endangered Species Act (ESA), and the Administrative Procedure Act (APA). However, as discussed below, Plaintiffs do not meet any of the four elements required for a preliminary injunction. Therefore, the Court should deny Plaintiffs' motion.

## II.     LEGAL BACKGROUND

### A.     National Environmental Policy Act

The National Environmental Policy Act ("NEPA") serves the dual purpose of informing agency decision-makers of the environmental effects of proposed Federal actions and ensuring that relevant information is made available to the public so that the public may "play a role in

---

[1] Plaintiffs make a number of factual assertions and characterizations in the "Statement of Facts" section, *see* Pls.' Mot. 3-11, but then do not specifically address how these "facts" relate to their arguments.  Plaintiffs' "facts" that are not specifically discussed in Defendants' opposition brief are discussed or rebutted within the administrative records lodged with the Court and within the four supporting rebuttal declarations attached to this brief.

both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA does not mandate a particular result or impose substantive environmental obligations on Federal agencies. *Id.* at 351-52; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). Instead, NEPA ensures that an agency has adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary and capricious. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-17 (1971). NEPA requires the preparation of an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). In reviewing NEPA decisions, courts evaluate whether the analysis includes a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (internal quotation marks omitted).

### B.      Wild and Scenic Rivers Act

In 1968, Congress enacted the Wild and Scenic Rivers ("WSR") Act ("WSR Act" or "the Act")), 16 U.S.C. §§ 1271-1287, creating a National WSR System ("River System") for designated rivers and river segments. *Id.* §§1272-73. Congress enacted the WSR Act to preserve the free-flowing condition, outstandingly remarkable values, and water quality of certain selected rivers of the Nation. *Id.* § 1271. The Middle Fork Clearwater River and adjacent land are designated components of the River System, administered by the Secretary of Agriculture. *Id.* § 1274(a)(1). "The [Act] imposes both procedural and substantive requirements on the agencies responsible for administering a designated area." *Sierra Club v. United States*, 23 F. Supp. 2d 1132, 1136 (N.D. Cal. 1998). Agencies administering components of the River System must protect and enhance the free-flowing condition, water quality, and outstanding remarkable values of designated rivers and river segments. 16 U.S.C. §§ 1271, 1281.

### C.      National Forest Management Act

Administration of the Nez Perce-Clearwater National Forest is governed by the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687, which provides for forest planning

and management at two levels:  the forest level and the individual project level. At the forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." *Id*. § 1604(a). A forest plan is a general planning tool that establishes the overall management direction for the National Forest unit, and serves as a programmatic statement of intent to guide future site-specific decisions. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003). As flexible guidance documents, forest plans may be "amended in any manner whatsoever" after adoption. *Id*. § 1604(f)(4). The Forest Service ("USFS") has broad discretion in formulating forest plans to establish and meet desired future conditions on the forest. *See id*. § 1604(g). At the project level, USFS undertakes site-specific projects, such as the Project at issue here. Under NFMA, site-specific projects must be consistent with the applicable forest plan. *Id*. § 1604(i). USFS's interpretation and implementation of its own forest plan is entitled to substantial deference. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097, 1099 (9th Cir. 2003).

### D.    Endangered Species Act

The Endangered Species Act ("ESA") directs that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. Pt. 402. If a proposed action "may affect" a listed species, the action agency must conduct "informal consultation" or "formal consultation" with the appropriate expert consulting agency, either the National Marine Fisheries Service (NMFS) for marine species or the U.S. Fish and Wildlife Service (FWS) for terrestrial and freshwater species. 50 C.F.R. § 402.14(a)–(b). Informal consultation is a "process that includes all discussions, correspondence, etc., between [NMFS or FWS] and the Federal agency . . . designed to assist the [action agency] in determining whether formal consultation . . . is required." *Id*. § 402.13(a). "If during informal consultation it is determined by the [action agency], with the written concurrence of [NMFS or FWS], that the action is not likely to

adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id*.

Formal consultation under Section 7 of the ESA culminates in a biological opinion (BiOp), which includes a "detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h)(2). The BiOp assesses the likelihood of the proposed action resulting in jeopardy to a listed species or destruction or adverse modification to designated critical habitat. 50 C.F.R. § 402.14(g). If an action is not likely to result in jeopardy or damage to critical habitat, but is certain to result in a "take" of a listed species, then the consulting agency attaches an "incidental take statement" to the BiOp. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i-v). If the action agency implements the project as proposed and complies with the terms and conditions of the incidental take statement, ESA § 7(o)(2) exempts the specified level of take from the ESA § 9 take prohibition. 16 U.S.C. § 1536(o)(2).

Both informal and formal consultation were completed in this case.

### E.   Administrative Procedure Act

A court's review of an agency's compliance with NEPA, NFMA, and the ESA is governed by the Administrative Procedure Act ("APA"). *See Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 760 n.5 (9th Cir. 2005). Under the APA standard of review, an agency's final decision must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). "[T]his standard is highly deferential, presuming that agency action to be valid." *Cal Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (internal quotation marks omitted); *see also River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010) (explaining that plaintiff must satisfy a "high threshold" to set aside federal agency actions under the APA). The Court must "not substitute [its] judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.) (en banc). "The [agency's] action . . . need only be [ ] reasonable, not the best or most reasonable, decision. *River Runners*, 593 F.3d at 1067 (citations omitted). The Court is to be "most deferential" when, as here, "the agency is making predictions, within its

[area of] special expertise, at the frontiers of science." *Lands Council*, 537 F.3d at 993; *see also see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (same). The Court's role "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).

### F.      Standard for Obtaining a Preliminary Injunction

An injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.[2] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under this standard "it is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction should issue." *Monsanto*, 561 U.S. at 158. In applying the four-prong standard, the Ninth Circuit employs a sliding-scale approach whereby a "stronger showing of one element may offset a weaker showing of another." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this standard, a preliminary injunction is appropriate where a plaintiff demonstrates that "serious questions going to the merits were raised" and that "the balance of hardships tips sharply in the plaintiff's favor," but only so long as the plaintiff also shows "there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. Under this approach, a plaintiff must demonstrate a "substantial case for relief on the merits." *Id.* If the Court finds that Plaintiffs have not shown either likelihood of success or a serious question as to

---

2 When one party is a United States agency, the public interest and the agency's interest merge and the public interest weighs in favor of the agency's decision.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

the merits, it can deny the preliminary injunction without addressing the equitable factors. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013).

**III.   ARUGMENT**

    **A.   Plaintiffs are not likely to succeed on the merits of their NEPA claims.**

        1.   <u>USFS was not required to prepare a supplemental EIS.</u>

Plaintiffs contend USFS was required to prepare a supplemental EIS to the 2016 final EIS and to consider significantly new circumstances or information—specifically information regarding fires that occurred in 2015, adjacent to the Johnson Bar fire. Pls.' Mot. 12-13. USFS has fully met its obligations to consider this information.

An agency is required to consider whether new information or changed circumstances that are relevant to environmental concerns require supplementation of an EIS and to make a reasoned decision as to whether that information is of such significance as to require supplementation. 40 C.F.R. § 1502.9(c)(1)(ii); *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 855 (9th Cir. 2013); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000). Supplementation is not required "every time new information comes to light," but only if the new information or circumstances show that "the quality of the human environment" will be affected "in a significant manner or to a significant extent not already considered." *Idaho Wool Growers Ass'n v. Vilsack*, No. 14-35445, 2016 WL 805683 at * 8 (9th Cir. Mar. 2, 2016). No specific form for this consideration is required, but an agency must document that the new information was considered and a determination made whether supplementation is required. *California v. U.S. Dep't of the Interior*, 762 F.3d 781, 797 (9th Cir. 2014); *Great Old Broads for Wilderness,* 709 F.3d at 855.

USFS fully considered whether 2015 fires presented new information and potentially changed circumstances required supplementation of the final EIS in a memorandum dated

October 26, 2015. FS662-8.[3] This analysis and its conclusion that none of the impacts of the subsequent fires "would cumulatively change the effects of the analysis of the Johnson Bar FEIS," FS668, fully meets the requirements that new information be considered, and that a "reasoned" decision be made based on this information. *Great Old Broads for Wilderness,* 709 F.3d at 855; *Friends of the Clearwater*, 222 F.3d at 557. Plaintiffs object that the manner in which USFS considered this new information deprived the public of an opportunity to comment, Pls.' Mot. 13, but fail to cite any authority suggesting that NEPA supplementation is required for such determinations. *California*, 762 F.3d at 797. Nor could they; courts defer to an agency's reasonable determinations regarding supplementation unless it is arbitrary and capricious. *Marsh,* 490 U.S. at 379.

Nor do USFS's objection resolution regulations require supplementation here. Although the basis for Plaintiffs' objections was a document, dated October 2015, and entitled Final Environmental Impact Statement, FS672, it is not the final EIS. Within the context of the pre-decisional review process, the October EIS is in the nature of a preliminary draft of the final EIS. Pursuant to the applicable regulations, the final EIS is the document filed with the Environmental Protection Agency ("EPA") for publication of notice of availability. 36 C.F.R. § 220.5(f); 40 C.F.R. §§ 1506.9(a), 1506.10(a). The final EIS filed, and for which the EPA published a notice of availability, was the January 2016 final EIS. *See* FS1257 *et seq*. (1B-0013). The January 2016 EIS is not a "revised" final EIS for purposes of 36 C.F.R § 218.22(d). The Forest was, therefore, not required by 36 C.F.R. § 218.22(d), to provide an opportunity to comment on any changes incorporated into the January 2016 final EIS prior to its issuance.

---

[3] Citations to the Forest Service's administrative record are denoted by FS followed by the Bates number, which is located on the top, left-hand corner of each page. Citations to the FWS and NMFS record are preceded by NMFS or FWS, respectively, followed by the Bates number, which can be found at the bottom, right-hand corner.

Plaintiffs also incorrectly represent that the objection resolution officer found that the 2015 fires constituted significant new changed facts and circumstances.[4] Pls.' Mot. 13. While Plaintiffs contended that the 2015 fires and in particular the Wash, Slide, and Woodrat fires, constituted new information that required a supplemental EIS, FS32825-26, the objection resolution officer rejected that contention. FS32994. The resolution officer did instruct USFS to update the economic analysis to include salvage operations related to both the 2014 and 2015 fires, but he did not find nor even imply that this was significant new information that required supplementation. FS32993.

2.    <u>USFS adequately analyzed sedimentation impacts.</u>

Plaintiffs first argue that because USFS did not use the Geomorphic Road Analysis & Inventory Package ("GRAIP") model, the final EIS's conclusions of minimal sedimentation risks from the Project (above and beyond what is occurring naturally) underestimates the risks and lacks scientific integrity.[5] Pls.' Mot. 14. Plaintiffs argument lacks merit as USFS's decision to use the peer-reviewed Water Erosion Prediction Project ("WEPP") model rather than the GRAIP

---

[4] The objection resolution officer's actions were conducted pursuant to the pre-decisional administrative review procedure set forth in 36 C.F.R. Part 218. This process was established in compliance with legislation. *See* 59 Fed. Reg. 18,481, 18,482 (Mar. 27, 2013).

[5] As an initial matter, Plaintiffs' arguments rely heavily on four declarations that were not submitted during the Forest Service's NEPA process, but instead were prepared after the fact for this litigation. *See* ECF Nos. 14-2, 14-3, 14-4, 14-9. Although a reviewing court may consider an extra-record evidence under the four, narrow exceptions to the record review rule, *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1117 (9th Cir. 2007), none of these exceptions apply here. But a court may not consider such evidence to review or second guess "the correctness or wisdom of the agency's decision." *Asarco, Inc. v. Envtl. Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980); *see also Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (upholding decision to strike extra-record documents that were not before the agency); *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive.") (internal quotation marks omitted). Accordingly, these declarations—to the extent that Plaintiffs' use them to support their arguments on the merits—should be stricken, as should any part of the Plaintiffs' brief that relies on them.  To the extent that the Court considers Plaintiffs' declarations, the Court should also consider Defendants' rebuttal declarations.

model, which has neither been calibrated on the Nez Perce-Clearwater Forest nor published in peer-reviewed scientific journals, is fully justified. Lloyd Decl. ¶¶ 12-13; Smith Decl. ¶ 16. USFS used WEPP for the Project to help establish mitigation measures (*e.g.*, Best Management Practices) and predict their effectiveness in reducing sediment delivery to streams. As Plaintiffs suggest, GRAIP can identify road segments or road stream crossings that pose a high risk for causing landslides related, and thus need mitigation measures to minimize potential impacts. FS1639. Here, however, in 2014, a Burned Area Emergency Response ("BAER") team, which included hydrologists, soil scientists, engineers, vegetation specialists, archeologist, and fish biologists, conducted field analyses by surveying the entire road system inside the Project area (which encompasses the Johnson Bar fire perimeter). Using extensive post-fire analysis of each watershed and stream crossing, the BAER team identified all road segments and stream crossings at high risk of failure due to increased runoff. FS2041-42. The team then recommended actions for road improvements that would mitigate these risks, FS2043, which are now already funded and scheduled for implementation as a separate project. FS1316, 1361-62, 1447.  Use of GRAIP for this Project would have offered only redundant information that was already collected by field assessment.  At any rate, as relevant to the Project here, GRAIP has additional drawbacks: it does not analyze sediment delivery from harvested hillslopes (which WEPP does, FS1357; FS17967); it is not calibrated for local conditions; and it is not a peer-reviewed published model. Lloyd Decl. ¶¶ 12-13.

For this Project, USFS, in collaboration with NMFS and FWS, used the dual capacity of WEPP to perform: (1) an analysis of sediment delivery points to streams from haul roads using the data from the BAER report to design mitigation measures that would eliminate or reduce chronic sediment delivery from existing points, FS1339, 1357; FS17966-67, 17969, 17974-76, 17981, 17984; and (2) an analysis of potential sediment delivery due to erosion from harvested slopes, temporary roads, and swing trails that lead to the design of additional mitigation measures to reduce erosion risk.  FS1342, 1355, 1365; FS17965, 17983.  Unlike WEPP, GRAIP

only predicts erosion from System roads (haul roads).  Therefore, it could not have been used to predict sediment from the full-range of Project activities. FS17974.

Although Plaintiffs may not agree that WEPP is the appropriate model to use to analyze sedimentation risk in this case, Plaintiffs' claim "raises a quintessential 'battle of the experts,' which falls short of demonstrating a NEPA violation." *Ctr. for Biological Diversity v. Skalski*, 61 F. Supp. 3d 945, 958 (E.D. Cal. 2014) (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010)).

Plaintiffs are also wrong that USFS failed "mention" or to consider past landslide activity.  *See* Pls.' Mot. 14.  The final EIs documents the two landslides that occurred in the Project area, FS1319, and documents the analysis and treatment of landslide prone areas in various places within the final EIS, including the "Affected Environment," "Landforms and Geology", and "Landslide and Erosion Hazard Potential" sections, among other places.  *See* Lloyd Decl. ¶ 3.

Using WEPP, the USFS provided a robust overall analysis of chronic sediment delivery from both roads and harvested areas, and, in collaboration with NFMS and FWS, methodically identified, carefully designed, and incorporated mitigation measures that would reduce the Project's impacts.[6]  *See* FS5939-42, 5998, 6243-45; FS1908-18; NMFS4216-30. These mitigation measures were also incorporated as part of NMFS's incidental take statement and included in the Biological Opinion.  NMFS4216-30. The Court should defer to USFS's choice of models, particularly relating to "technical analyses and judgments involving the evaluation of complex scientific data . . . ."  *Def.-Blue Mountains Biodiversity Project.*, 615 F.3d at 1130; *see also San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) ("As part of this deference, we afford the agency discretion to choose among scientific models; we 'reject an agency's choice of model only when the model bears no rational relationship to the

---

[6] Plaintiffs also argue that use of the NEZSED model was inappropriate. Pls.' mot. 14. NEZSED, however, was used only to compare impacts between alternatives, FS1342; Smith Decl. ¶¶ 14, 15, 17, 18, and not to determine actual, potential sediment delivery.

characteristics of the data to which it is applied.'") (quoting *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014)). Plaintiffs have failed to demonstrate they are likely to succeed on this claim.

### 3.     Cumulative impacts were adequately considered

Plaintiffs argue that the final EIS failed to accurately evaluate the cumulative impacts[7] of mass sedimentation due to private, state, and federal post-fire salvage harvests in the Project area. *See* Pls.' Mot. 16. This claim is likely to fail.

For example, as explained above, USFS appropriately modeled and field-verified the sediment risks of the Project, and, in collaboration with NMFS and FWS, developed mitigation measures to minimize or eliminate those Project impacts. FS001303-13.  The cumulative effects analysis for water quality was performed over nine watersheds, plus the 6th-HUC watershed within the proposed Project Area, and includes consideration of concurrent and foreseeable future actions, such as grazing, road maintenance, recreational trails, prescribed burn projects, and timber harvest activities.  FS1360-64. USFS concluded that "based on the analysis, the [Project] was not predicted to incrementally add to cumulative effects to water resources in the analysis area, because net effects to each management indicator were predicted to be neutral or positive." FS1360-61.  Similar analyses were done for other resources, such as fisheries, FS1391, soils, FS1446-51, and visual quality.  FS1498-500; *see also* Smith Decl. ¶ 23.

Contrary to Plaintiffs' assertion that cumulative effects analysis did not take into account the salvage harvests anticipated after the 2015 wildfires, it did, and the analysis was included in the post-objection final EIS. FS662-68, 1395, 1535-37, 1562-64, 1904; Lloyd Declaration ¶¶ 8-10. The final EIS noted that only 14 acres of the 2015 fires burned within the Project area and an additional 96 acres occurred just outside the boundary but within the O'Hara Creek drainage. FS1534; FS4511. As a result, the entire lower O'Hara Creek was considered for effects to ESA-

---

[7] Cumulative impacts are the impacts on the environment which result from the incremental impact of the proposed action (here, the Project) when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.7; 33 C.F.R. § 320.4(a)(1).

listed fish species. FS1366-74. USFS found only minor to no cumulative changes to the impacts on streams and listed fish from sedimentation (and, as a result, was not required to reinitiate ESA Section 7 consultation with FWS on the bull trout (which concluded on July 6, 2015)), *see infra* Section E. FS004509; FWS1. USFS did, however, provide NMFS with this information as an update to the ongoing formal ESA Section 7 consultation. FS004409. NMFS incorporated the information into its BiOp and found that the mainstem reaches of the Selway and Middle Fork Clearwater Rivers are powerful sediment transport reaches and sediment effects are likely to be minor and temporary as a result the 2015 fires. NMFS4255; FS4450. NMFS found Project effects on ESA-listed fish were not a concern in the mainstem Selway and Middle Fork Clearwater Rivers when added to post-fire baseline conditions. NMFS4276; 4297-98.[8]

To the extent that Plaintiffs "believe there will be additional private and state" timber harvest, Lewis Decl. ¶ 32, these are not "reasonably foreseeable actions" that need to be considered.  It is not possible to measure the impacts of a future project until there is a reasonable degree of certainty about the scope of the project and the activities proposed.  As the Supreme Court has explained, without a concrete proposal, there is no "factual predicate" on which to base a consideration of the action's impacts; only when the agency "deals with a specific action of known dimensions" are the "bounds of the analysis . . . defined." *Kleppe v. Sierra Club*, 427 U.S. 390, 401-02 & n.14 (1976); *id.* at n.20 (rejecting argument that agency must prepare EIS to assess impacts of "contemplated projects in the region as well as those that

---

[8] To the extent that Plaintiffs argue that the Forest Service should have considered the Project's impacts within the larger boundaries of the 2015 burn areas adjacent to the Project area, that argument must be rejected. As a legal matter, the Forest Service's determination of the scope of analysis is entitled to deference. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) (reviewing court must "defer to an agency's determination of the scope of its cumulative effects review"). Moreover, the final EIS's Hydrology and Fisheries analysis areas for cumulative effects was conducted at the Forest Plan prescription and HUC 6 watershed levels. FS001366. The Project's effects at this level were already considered immeasurable, minor, or positive. FS001384, 1386. The inclusion of the larger area including all the area burned in 2015, as proposed by Plaintiffs, would only further dilute the already immeasurable sediment impacts of the Project. Lloyd Declaration ¶¶ 8-10.

already have been proposed"); *see also Environmental Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006) ("[B]ecause the parameters of the Meteor project were unknown at the time of the EA, it was not arbitrary and capricious for USFS to omit the project from its cumulative analysis."); *National Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1478 (D.C. Cir. 1990) ("[A]n EIS need not delve into the possible effects of a hypothetical project, but need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be connected to or act cumulatively with the proposal at issue").

The cumulative effects analyses were adequate, supported by the record, and the Court should find that Plaintiffs are not likely to succeed on the merits of this claim and deny their motion. *Selkirk Conservation All. v. Forsgren,* 336 F.3d 944, 958 (9th Cir. 2003) ("[D]etermination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies.").

    **B.**    **Plaintiffs fail to show any violation of the Wild and Scenic Rivers Act.**

        1.    <u>The WSR Act does not require USFS to adopt a river plan.</u>

Plaintiffs contend that USFS does not have a valid river management plan, and without one, approval of the Johnson Bar Project violates section 1274(d) of the WSR Act. Pls.' Mot. 18 (citing 16 U.S.C. §§ 1274(d)(1)-(2)). As discussed below, Plaintiffs' claim should be rejected out of hand.

To be sure, the Ninth Circuit has already opined that nothing in the WSR Act "expressly require[s] a federal agency to prepare a management plan for a river designated . . . before January 1, 1986, in order to conduct land management activities on federal land adjacent to or within the protected river area . . .." *Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 818 (9th Cir. 1990). Just as in *Tyrrel*, the rivers here were designated prior to the 1986 amendments to the Act, which amended the Act to include section 1274(d)(2), and provides that for such rivers, "all boundaries, classifications, and plans shall be reviewed for conformity with the requirements of this subsection within 10 years through regular agency planning processes." 16 U.S.C.

§ 1274(d)(2). Reading section 1274(d) in context, the Ninth Circuit noted that, although it may

be a "prudent measure" for the agency to prepare a river management plan "prior to embarking

on land management activities," nothing in the WSR Act gives a court "authority to impose

procedural requirements upon a federal agency which seeks to exercise the responsibilities

committed to it by Congress." *Tyrrel*, 918 F.2d at 816, 818; *Cf. Vt. Yankee Nuclear Power Corp.*

*v. Natural Res. Def. Council, Inc.*, 433 U.S. 519, 544-45 (1978) (stating that reviewing court

should avoid imposing procedures on an agency not required by the APA). Rather, the Act

expressly allowed for an agency to take action so long as its actions and policies "conform . . . to

the purposes" of the WSR Act. *Id.* at 817 (citing 16 U.S.C. § 1283(a)). "A requirement to

consider river values protected under the Act in the course of undertaking any independent

project or plan differs from a procedural requirement that federal agencies prepare a plan under

the Act itself." *Id.*

Here, Plaintiffs raise the same argument—that USFS cannot proceed with a site-specific

project until a river management plan is adopted—that the *Tyrrel* court rejected.[9] Plaintiffs have

not provided any rationale of why this Court should reject Ninth Circuit precedent. Indeed,

Plaintiffs don't even attempt to argue why the *Tyrrel* court's holding would not apply here.

Plaintiffs have failed to demonstrate either that they are likely to succeed on the merits of this

claim, or that serious questions exist.

2.      The Project protects the scenic value of the WSR Corridor.

---

[9] Notably, although Plaintiffs' Complaint asks this Court to order USFS to adopt a
comprehensive river management plan within a reasonable amount of time, Compl. 35, ECF No.
1, Plaintiffs, neither Plaintiffs' Complaint, *see* Compl. §§ 87-94, nor their Motion for Summary
Judgment, *see* Pls.' Mot. 16-20, asserts the WSR Act claim as a claim for relief under section
706(1) of the Administrative Procedure Act, which could allow the Court to "compel agency
action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  At any rate, USFS has
met section 1274(d)(2)'s review requirements through USFS's regular planning process by
incorporating the River Plan into its Forest Plan.  In addition, the River Plan will be reviewed as
part of the ongoing forest plan revision process.

Plaintiffs argue that because the Agency "allow[ed] economic factors to drive the decision-making process," the Project will "threaten the scenic and aesthetic integrity of the Wild and Scenic corridor," and thus violate the WSR Act's mandate to place a primary emphasis on Wild and Scenic values and take actions to protect these values on lands "within or adjacent to the designated river corridor." Pls.' Mot. 18 (internal quotations omitted) (citing 16 U.S.C. §§ 1281(a), 1283(a)). The proposed Project would harvest of fire-affected trees over 2,104 acres. FS1903. Harvest design would leave individual trees, as well as clumps of trees and legacy trees wherever possible. *Id.* Other than 31 acres of harvest for public safety and fire control purposes, FS1925, 1939, all other harvest activities are outside of the WSR corridor boundary where timber harvest is not restricted. FS018274. Several units proposed for harvest in the draft EIS "proposed action" that were within the viewshed of U.S. Highway 12 have also been eliminated in the selected alternative to minimize impacts to scenic quality. *Id.* As demonstrated below, USFS adequately analyzed the potential impacts of the action alternatives on the visual quality of the corridor; substantially eliminated or reduced harvest activities, and thus potential impacts, in the proposed Project; and reasonably determined that the proposed Project will not impact the corridor's aesthetic values. Plaintiffs are unlikely to succeed on the merits of this claim; their motion should be denied.

Section 10(a) provides that "each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in the [ ] system" with the primary emphasis being "given to protecting esthetic, scenic, historic, archeologic, and scientific features." 16 U.S.C. § 1281(a). Section 12 requires that any federal agency with jurisdiction over lands that "include, border upon, or are adjacent to, any [designated] river" "take such action . . . as may be necessary to protect such rivers in accordance with the purposes of this chapter." 16 U.S.C. § 1283(a). Aside from making general and conclusory allegations that the Project violates these provision of the Act because the "primary purpose is to benefit the local economy," Pls. Mot. 19, Plaintiffs do not demonstrate how the Project "threatens the scenic and aesthetic integrity of the Wild and Scenic corridor." *Id.*

USFS analyzed the impact of the Project on visual and scenic values from critical viewpoints (major roads, trail access corridors, campgrounds, and concentrated use areas) in and adjacent to the Project area in several ways—including analyzing visual quality objectives[10] maps, field visits, and visibility modeling—to ensure that those qualities would not be impacted. FS0888-889; FS0890 (map of critical viewpoints); FS0894 (table listing critical viewpoints and visual quality objectives). In order to maintain the scenic quality, USFS reduced or eliminated harvest activities between the proposed action and the selected alternative in units where the visual quality objective was high (retention)—four harvest units within the U.S. Highway 12 viewshed were eliminated (units 101, 102, 143, and 144), and in the Selway River viewshed, harvest activities in one unit was greatly reduced (unit 104) and one unit was eliminated altogether (unit 126). FS0898-902 (compare Tables 3-53, 3-54, and 3-55). The Viewpoint Review demonstrates how elimination of or reduction in harvest activities in these units greatly decreases the visual impact of the proposed Project. FS 018337-352 (compare Alternative 4 with other alternatives for units in "retention" visual quality objective); *see also* FS018273-275.

What is more, the Project includes design criteria that would reduce any visual effect that might otherwise occur from harvest activities. *See generally* FS018335-18355 (see Alternative 4). These design features include, but are not limited to, maintaining the vertical structure and "feathered edge" to emulate natural openings that would remain after a mixed severity wildfire; designing harvest units to emulate natural edge patterns by minimizing geometric lines; locating skyline corridors and skid trails to minimize visual effect, and protecting vegetation that provides foreground screening along Swiftwater Road. FS0725-726; FS1915-16. Reforestation will be

---

[10] Visual quality objectives "are a desired level of scenic quality and diversity of natural features based on physiological and sociological characteristics of an area, and refers to the degree of acceptable alterations in the landscape." FS0891.  Visual quality objectives of the areas proposed for treatments as assigned under the current Forest Plan.  *Id.*  Objective levels defined in the Forest Plan include: preservation; retention; partial retention; modification; and maximum modification.  *Id.*

carried out where necessary to restore the visual quality impacted by the fires, and to protect watershed values. FS0725.

The extra-record declarations of Kevin L. Lewis and Gary Macfarlane do not provide any support for Plaintiffs' argument that *this* Project will result in the same sorts of visual impacts that harvest activities carried out on State and private land have had.[11] *See* Lewis Decl. ¶¶ 23, 24 (ECF No. 14-4); Macfarlane Decl. ¶¶ 11-13 (ECF No. 14-9). The determination of what impact this Project will have on aesthetics must be reviewed based on the administrative record before the Court. The record here shows, as discussed above, that the proposed Project will protect the scenic and aesthetic quality of the Wild and Scenic corridor. In the end, Plaintiffs are not likely to succeed on the merits of this claim.

>3.    Harvest in the WSR Corridor is consistent with the River Plan.

Plaintiffs argue that the Project's authorization to conduct timber harvest on 31 acres within the Wild and Scenic River corridor is inconsistent with the River Plan and thus violates NEPA because USFS "failed to consider any non-harvest action alternatives and timber harvest is not the only practicable method of achieving non-economic resources values." Pls. Mot. 20. The River Plan, which is incorporated into the Nez Perce Forest Plan, allows timber harvest for "[p]ublic safety," "[c]ontrol of fire . . . when such cutting is determined to be the only practical method of control," or for "[a]pproved road and trail locations." FS032122. Here, USFS ROD explicitly discloses how it meets the River Plan's restrictions on timber harvest: "The 31 acres[12] within the Wild and Scenic River Corridor are being included due to the fact that dead trees are

---

[11] This case is unlike that in *Idaho Rivers United v. Hudson*, No. 3:15-cv-169-BLW (D. Idaho), where the Court found that the agency violated the WSR Act because  did not make any assessment in how its authorization allowing logs to be hauled over a road within the WSR corridor would impact Wild and Scenic values.  Memorandum Decision 7-8 (Mar. 28, 2016), ECF No. 41.

[12] Initially, USFS proposed harvesting 81 acres within the Wild and Scenic River corridor. *See* FS1858.  But after receiving comments from Plaintiffs, removed 50 of those acres from the Project that were not adjacent to private property or structures because they were not "needed to accomplish [the control of fire] objective."  FS032998.  The 31 acres proposed for harvest in the Wild and Scenic River Corridor are located entirely within unit 104. FS1903; FS1897 (Alternative 4 map).

falling onto the road, resulting in public safety concerns and the acreage is adjacent to private property." FS1903; *see also* FS1509 ("The [Project] is designed to address future fire control issues associated with increased fuel load caused by the wildfire.").

A portion of the 31 acres runs along Forest Service Road 470 and will be harvested for public safety reasons. FS1903. Under the River Plan, USFS does not have to consider whether harvest is the "only practical method" when done so to protect public safety. USFS therefore met the River Plan requirements, and thus complied with NFMA.

With respect for the acreage that will be harvested to mitigate future fire severity, the record demonstrates that USFS considered the alternative of not removing the standing snags. FS1293. The Fire and Fuels Report and the Silviculture Report "reveal the potential for portions of the project area to reburn if no action is taken to address the existing burned timber." FS1509. Studies show that fuel loads increase after a fire over time as the fire-killed snags fall. FS1716. In areas like the Project area where slopes often exceed 35%, the rate of spread of a fire is fast. *Id.* Without treatments, surface fuels would begin to accumulate, fire intensity and severity would be higher, and resistance to control would remain high and continue to increase. FS1333. The record therefore supports USFS's determination that leaving the fire-killed trees adjacent to private property and structures was not an effective means of addressing this risk. In other words, salvage of dead timber within the 31 acres was the only practical method to address potential future fire near structures on private property. USFS amply demonstrated that the Project meets the conditions for timber harvest within the WSR corridor under the Forest Plan. Plaintiffs have failed to show there is a likelihood that the Project violates NFMA.

C.    **Plaintiffs fail to show any NFMA violation.**

Plaintiffs argue that the Project is inconsistent with Forest Plan standards for watersheds and fisheries because the watersheds and fisheries are currently degraded and do not demonstrate an "upward trend." Pls.' Mot 21. It is true that many of the streams within the Project area do not currently meet their Forest Plan objectives but Plaintiffs' argument completely misconstrues the Forest Plan's "upward trend" requirement. Smith Decl. ¶¶ 20-22. Project activities are permitted

even with substandard water/fisheries conditions if the watershed improvement activities would result in an upward trend. FS1371 ("[I]t is assumed that implementation of watershed restoration activities would result in an upward trend . . . ."); *see also* FS1655-77 (Upward Trend Analysis). Additionally, there is no requirement that the upward trend aspects of a project (*i.e.*, the watershed improvement activities) be implemented first. FS1371. Here, as demonstrated by numerous mandatory mitigation measures (developed through the WEPP modeling),[13] the Project will have minimal short-term negative effects associated with increased sedimentation. FS1362-63. The Project will have a long-term positive effect associated with road improvements and decommissioning. FS1387. The combined road-related projects are expected to maintain a long-term upward trend through reduced sediment delivery and runoff from roads to stream and aquatic habitats throughout the watershed. FS1659-75. Reduced chronic sediment delivery is expected to allow for a continued upward trend for reduced cobble embeddedness levels and improved fish habitat carrying capacity over time. FS1676-77. The Project is consistent with the Forest Plan standards for water quality and fisheries and the Forest Service's conclusions on this issue are reasonable, supported by the record, and should be upheld. The Project thus complies with NFMA. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097, 1099 (9th Cir. 2003) (showing deference to an agency's interpretation of its own Forest Plan).

### D.       Plaintiffs are not likely to succeed on their ESA claims.

USFS, through its Biological Assessment, candidly acknowledged the potential effects of the Project, including the potential adverse effects on the Chinook salmon, steelhead, and bull trout and their habitat resulting from increased sedimentation due to the Project. FS6161-80. As explained above, to minimize or eliminate the possible adverse effects, USFS, in consultation with NMFS and FWS, jointly developed and included, as part of the proposed action, mandatory conservation measures in the form of project-specific design criteria and best management

---

[13] Contrary to Plaintiffs' assertions, no part of this analysis was ever premised on the FISHSED or NEZSED modeling results. Rather, as explained above, the analysis was based on all existing data and past, current, and future activities. FS1371-72.

practices to help protect the listed species including, among others: removal of only dead or dying trees, FS6117, 6124; reforest burned harvest units, FS6124-25; skyline yarding and helicopter operations to be used in 97% of the harvest units to avoid soil disturbance and erosion risks, FS6125; tractor harvest limited to 3% of the harvest units and confined only to ridgetop locations disconnected from drainage networks, FS6125; landslide prone areas to be field verified and excluded from harvest units and given 100 foot PACFISH buffer, FS6136; no ground-based harvest on slopes over 35%, FS6136; no timber harvest or associated activities within riparian habitat conservation areas or landslide prone areas, FS6137; application of slash and coarse woody debris on exposed soils to protect against erosion, and retain soil moisture and soil productivity, FS6137. *See also* FS6132-47 (listing all jointly developed protective measures eliminating or minimizing sedimentation which benefits the listed species).

As part of the consultation, NMFS and FWS reviewed the Forest Service's Biological Assessment and the best available scientific data gathered from other sources, site visits, meetings, etc., to determine whether Project activities would likely adversely affect any of these listed species.[14] With respect to the salmon and bull trout, NMFS and FWS noted that both species are only found in the mainstem Selway and Middle Fork Clearwater Rivers. NMFS4297; FWS2. Due to the extensive proposed mitigation measures and the large size and high volume of these rivers, the amount of increased sediment delivery from the Project to the mainstem Selway and Middle Fork Clearwater would be insignificant, and would not adversely impact the current water quality or habitat conditions. NMFS4276, 4288-89, 4297-98; FWS1-4. For these reasons, the agencies reasonably concluded that the increase in sedimentation from the Project (if any) would be insignificant and discountable and therefore "not likely to adversely affect" the salmon or bull trout or their habitat. NMFS4297-98; FWS1-4. These determinations concluded the informal Section 7 consultation on these two species.

---

[14] NMFS analyzed the potential Project effects on the chinook and steelhead (both marine species) and FWS analyzed the bull trout (a freshwater species). *See* NMFS4258-93, 4297-98 (BiOp) and FWS1-4 (Letter of Concurrence), respectively.

NMFS (and USFS), however, concluded that the potential short-term increase in sedimentation would "likely adversely affect" the steelhead and proceeded with formal Section 7 consultation to determine whether this impact was likely to "jeopardize" the steelhead or result in "adverse modification" of its designated critical habitat. NMFS4293. NMFS first noted that the two steelhead populations in the action area are not viable and their abundance and productivity would need to improve to enable recovery of the species. NMFS4292. Recovery is currently limited by mainstem river summer temperatures and by substrate sediment in the tributaries. NMFS4249, 4251, 4292. NMFS expected this condition to continue into the future. NMFS4292. Against this backdrop, NMFS next analyzed the Project and determined that Project activities would not cause changes in water temperatures and would result in short-term adverse sediment effects on steelhead habitat in six small areas in the tributaries. NMFS4269-70, 4273, 4284, 4288-89, 4292-96. NMFS determined that those effects were minor and would not reduce the short- or long-term recovery of the steelhead. NMFS4277, 4283-84, 4292. The Project was designed to reduce present sources of sediment input from burned hill slopes and roads, and project design and proposed mitigation would avoid adverse effects from almost all aspects of the Project. NMFS4265-66, 4271, 4275-76, 4283-84, 4292. Furthermore, adverse effects on steelhead and its habitat were anticipated to be limited to small sediment impacts to the tributary mouth areas in O'Hara Creek below six log haul stream crossings of these tributaries, which are adjacent to O'Hara Creek. NMFS4292. For these reasons, NMFS reasonably concluded that the Project was not likely to jeopardize the steelhead and adversely modify its critical habitat. NMFS4293.

Dissatisfied with these determinations, Plaintiffs now assert several misguided and conclusory arguments against NMFS and FWS predicated on alleged ESA violations. None of these arguments have merit, or even raise "serious questions." First, Plaintiffs take issue with the Agencies' use of the WEPP modeling in the Section 7 consultation process. Pls.' Mot. 16 n. 5, 21 n. 6. As explained above, the Agencies' use of the WEPP modeling was appropriate and allowed for a robust analysis of sediment delivery from both roads and harvested hillslopes. FS001342;

NMFS4265-66, 4272; FWS1-4. This allowed the Agencies to then jointly develop effective mitigation measures to minimize or eliminate this impact FS001342-43, 1431, 4456; NMFS4217-18, 4223-28; FWS1-4, 274, 258-60. The Agencies' use of the WEPP modeling results (along with relevant data from other sources) was appropriate and scientifically reliable. Plaintiffs' argument fails.

Plaintiffs' second argument claims that NMFS and FWS did not address the impacts of the subsequent 2015 wildfires in the Section 7 informal and formal consultations. Pls.' Mot. 16 n.5. This claim is wholly meritless. As an initial matter, FWS's informal consultation concluded on July 5, 2015, before the subsequent 2015 fires. Events occurring after completion of that consultation cannot be used to challenge FWS's conclusions. To the extent that Plaintiffs argue FWS had a duty to reinitiate consultation due to subsequent 2015 fires, that argument must be rejected. No such "failure to reinitiate" claim can stand against FWS, the consulting agency. It is the action agency (here, the Forest Service) in an ESA consultation process that "has the primary responsibility for implementing section 7's substantive command." 51 Fed. Reg. 19,926, 19,928 (June 3, 1986). FWS lacks authority to require an action agency to reinitiate consultation if that agency chooses not to do so. *Id.* at 19,956; *see Def. of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005). While it can recommend that an action agency reinitiate consultation, FWS cannot force an agency to do so and certainly has no duty to do so.[15]

In any event, the agencies (USFS, NMFS, FWS, and the Bureau of Land Management) all discussed the effects of the 2015 fires. FS6243-45, 6253. USFS's 2015 fire analysis found only minor to no changes to the impacts on streams and listed fish from sedimentation. FS668. This information was then provided to NMFS as part of the ongoing Section 7 consultation with

---

[15] Plaintiffs do not bring a "failure to reinitiate" claim against USFS in this case. *See* ECF No. 1. Even if such a claim were pled in the Complaint, Plaintiffs' would not be able to assert the claim at this time because they have not complied with the jurisdictional mandate requiring a 60-day "notice of intent to sue" letter. *See* 16 U.S.C. § 1540(g). Regardless, as explained above, the 2015 fires did not result in effects of the Project that would trigger reinitiation of Section 7 consultation duties.

NMFS. FS4509, 4518. NMFS incorporated the information into its BiOp and found that the mainstem reaches of the Selway and Middle Fork Clearwater Rivers are powerful sediment transport reaches and sediment effects are likely to be minor and temporary as a result of the 2015 fires. NMFS4255, 4298. Considering those and other baseline conditions, cumulative effects, and the all aspects of the Project, NMFS concluded that the Project was "not likely to adversely affect" the salmon and was not likely to jeopardize the steelhead or adversely modify its critical habitat. NMFS4293. Plaintiffs' argument that the agencies failed to consider the effects of the 2015 fires must be rejected.

> **E.    Plaintiffs have not demonstrated irreparable harm, have not shown that the balance of equities tips in their favor or that a preliminary injunction would serve the public interest.**

> A.    <u>There is no likelihood of irreparable harm in the absence of an injunction.</u>

The Supreme Court has held that the plaintiff carries the burden of demonstrating a likelihood of irreparable harm through a "clear showing" of "substantial proof." *Mazurek*, 520 U.S.at 972 (emphasis omitted) (citation omitted). *Winter* holds that a plaintiff must establish that irreparable harm is likely, not just possible. 555 U.S. at 22 (citations omitted), *see also Ctr. for Food Safety*, 636 F.3d at 1172 (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1131); *Monsanto*, 130 S. Ct. at 2757, 2757, 2760 ("An injunction should only issue if" it is "needed to guard against any present or imminent risk of likely irreparable harm."). Plaintiffs have failed to make the necessary showing of harm based on the procedural injuries, harm to species, or environmental/aesthetic injuries they allege.

First, Plaintiffs argue that the Project should be enjoined because they have "suffered procedural injury that can only be remedied by" an injunction. Pls.' Mot. 22. This, however, is an overly simplistic interpretation of the case law, and conflates the likelihood of success on the merits prong with the likelihood of irreparable injury prong of the preliminary injunction standard.

Second, Plaintiff's argument that there is a presumption of irreparable injury where environmental harm is alleged, Pls.' Mot. 22, overlooks Supreme Court precedent which states that an injunction "is not a remedy which issues as of course," even in environmental cases. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (citation omitted); *see also Winter*, 555 U.S. at 26 (finding other factors outweighed possible environmental harm); *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) (reaffirming that irreparable harm should not be presumed in environmental cases).

But Plaintiff's argument suffers from an even more fundamental defect because, as thoroughly demonstrated in Defendants' summary judgment brief, the Project will not impact the scenic, aesthetic, and recreational values of the WSR corridor at issue.

They have failed to demonstrate that the Project will cause imminent irreparable harm to the listed species in the case. Rather, Plaintiffs make only general, wholly unsupported allegations that impacts to local populations of the species in the area can have "adverse impacts" on the species. Pls.' Mot. 23-24. More importantly, however, Plaintiffs appear to take the position that any possible impact to the listed species, no matter how small, necessarily constitutes "irreparable" harm. *Id*. This is not the standard under the ESA, let alone under the stringent emergency injunction test. The very fact that the ESA contemplates "take" (*i.e.*, injuring or killing) listed species demonstrates that not every harm is irreparable. 16 U.S.C. § 1536(o). Rather, courts (including the Ninth Circuit) have long held that harm is irreparable only if "significant" to the "overall population" of the species in question. *Def. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009); *Fund for Animals v. Frizzell*, 530 F.2d 982, 986–87 (D.C. Cir. 1975); *Native Ecosystems Council v. U.S. Forest Serv*., 428 F.3d 1233, 1240 (9th Cir. 2005). Accordingly, Plaintiffs must present a "concrete showing of probable deaths during the interim period" and of how these deaths may impact the species as a whole. *Water Keeper All. v. U.S. Dep't of Def*., 271 F.3d 21, 34 (1st Cir. 2001).

Here, Plaintiffs make no such showing. NMFS and FWS—the expert wildlife agencies— have both concluded that no adverse effects will result to chinook or bull trout and only localized

minimal effects will result to individual steelhead. NMFS4292; FWS1-4. As the Ninth Circuit

has noted, "[u]nder *Winter*, plaintiffs must establish that irreparable harm is likely, not just

possible," *All. for the Wild Rockies*, 632 F.3d at 1131, and here Plaintiffs have failed to carry

their burden. Absent proof that potential harm is imminent and irreparable, Plaintiffs' motion

fails. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983).

**B.      The balance of hardships and public interest do not favor an injunction.**

In seeking a preliminary injunction, Plaintiffs "must [also] establish . . . that the balance

of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S.

at 20. With regard to balancing the equities, "courts 'must balance the competing claims of

injury and must consider the effect on each party of the granting or withholding of the requested

relief." *Id.* at 24 (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542

(1987)). Plaintiffs rely on the environmental injuries they allege will be suffered if injunctive

relief is not granted. Pls.' Mot. 24-25. Even if Plaintiffs were correct, environmental injuries, if

any, may be outweighed by other considerations, including risks to other resources and economic

harms that would be caused by the injunction. *See Winter*, 555 U.S. at 23-24; *W. Watersheds

Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012); *Earth Island Inst. v. Carlton*, 626 F.3d

462, 475 (9th Cir. 2010); *Lands Council*, 537 F.3d at 1004-05; *Olenec v. Nat'l Marine Fisheries

Serv.*, 765 F. Supp. 2d 1277, 1288 (D. Or. 2011) (holding that the Corps had "demonstrated

significant hardships that [the Section 404 permittee] and the local . . . economy would suffer

should the injunction issue).

In this instance, as shown in the Declaration of Michael J. Niccolucci and Declaration of

Joe B. Hudson which accompany this response, if the timber sales for the Johnson Bar project

are delayed, that delay will have serious consequences to the Forest Service's management of the

forest by precluding or delaying restorative actions, and will limit watershed restoration and

protection activities. Niccolucci Decl. ¶¶ 3-7, 10-17; Hudson Decl. ¶¶ 5-7, 14, 22-27, 29-46, 50-

54. If the timber subject to the contracts cannot be removed before the end of 2016, that timber

will have deteriorated such that it will also likely have no or limited value and not be saleable at

all. Niccolucci Decl. ¶ 12; Hudson Decl. ¶¶ 24-27, 39**.** The Commissioners for Idaho County express the same concerns over the loss of the economic viability of the Project if there is further delay as well as the risks of re-burns if the fallen timber is not removed. Declaration of Idaho County on Behalf of Idaho County Citizens, ¶ 10, and Exhibit A thereto. Further, without the timber sales and the actions required by those sales, many of these restoration actions will not occur and can occur later only if USFS is allocated the resources needed to engage in the necessary activities. Niccolucci Decl. ¶¶ 4-7, Hudson Decl. ¶¶ 42, 47-49, 55; Idaho Decl. ¶ 10.

Plaintiffs object in balancing alleged harms and the public interest to any consideration of economic injuries, and in particular to any consideration of injury to contractors, arguing that since the contracts were issued after their lawsuit was filed, those injuries should be ignored.[16] Pls.' Mot. 25. However, as shown in the Niccolucci Decl. ¶¶ 9-10, 13-17, the economic injuries that are suffered by delay in timber harvest activities are not limited solely to the specific contractors, but ripple to the general public and the regional economy of Idaho. Any risk that the specific contractors may have assumed does not affect those broader injuries. Delaying the proposed sales would also adversely affect the Forest Service's commitments to the Small Business Administration and the program the SBA administers. Niccolucci Decl. ¶ 11; Hudson Decl. ¶ 4.

In this case, where allowing the Project to proceed will result in more resilient forest and improved watershed conditions while benefiting the local and regional economy, the balance of harms and the public interest clearly favors denial of the requested injunctive relief.

## IV.   CONCLUSION

For the reasons stated above, this Court should deny Plaintiffs' Motion for a Preliminary Injunction.

---

[16]  Plaintiffs misinterpret the reliance in the FEIS on the impacts to the local economy. Pls.' Mot. 26 n. 8. The FEIS considers the resiliency and economic ratings on county wide basis and not just the small towns within those counties.  FS1324-25. The FEIS also recognizes that the communities tend to be more resilient than assumed and are diversifying.

Respectfully submitted,

DATED:  April 19, 2016

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

s/ Julia Thrower
JULIA S. THROWER
Trial Attorney
Natural Resources Section
301 Howard Street, Suite 1050
San Francisco, CA  94105
(415) 744-6566 (tel)
julie.thrower@usdoj.gov

RICKEY D. TURNER
Trial Attorney
Wildlife and Marine Resources Section
999 18th St.,
South Terrace, Suite 370
Denver, CO 80202
Telephone:  (303) 844-1373

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 19, 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Deborah A. Ferguson

daf@fergusondurham.com

Laurence J. Lucas

llucas@advocateswest.org

Marc A. Shumaker

mshumaker@advocateswest.org

*Attorneys for Plaintiffs*

s/Julia Thrower
JULIA S. THROWER

*Attorney for Defendants*