Laurence ("Laird") J. Lucas (ISB# 4733)
Marc Shumaker (ISB #9606)
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
208-342-7024
llucas@advocateswest.org
mshumaker@advocateswest.org

Deborah A. Ferguson (ISB# 5333)
Ferguson Durham, PLCC
223 N. 6th Street, Suite 325
Boise, ID 83702
208-345-5183
daf@fergusondurham.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO RIVERS UNITED, and<br>FRIENDS OF THE CLEARWATER,<br><br>       *Plaintiffs,*<br><br>  v.<br><br>NEZ PERCE-CLEARWATER FOREST<br>SUPERVISOR CHERYL F. PROBERT;<br>UNITED STATES FOREST SERVICE;<br>NOAA FISHERIES; and U.S. FISH AND<br>WILDLIFE SERVICE,<br><br>       *Defendants.* | No. 3:16-cv-102-CWD<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br>(*Docket No. 12*) |

**INTRODUCTION**

Defendants argue that an injunction would trigger a host of environmental, economic, and other harms – but as explained below, these claims are overblown and contradicted by their own FEIS. Moreover, Plaintiffs' challenges can be expedited for resolution on the merits rapidly, such that any stay would be brief.

Defendants tout the supposed sediment reduction benefits of the Project from decommissioning 21 miles of roads. But these "roads" are mostly overgrown and unused already, and Defendants admittedly have no data showing that they are a sediment problem at all. Their plan to "decommission" most of them is simply to take no action, while taking credit for their "natural recovery." As explained below, this ploy violates the Forest Plan, which precludes logging and construction in the Project's watersheds that remain degraded and do not meet Forest Plan fisheries standards.

The FEIS and ROD also violate NEPA and the Wild and Scenic Rivers Act in multiple ways, including by failing to assess the cumulative impacts of the state and private land logging that has occurred with the Forest Service's authorization. And Defendants misstate the holding in *Wilderness Society v. Tyrrel*, 918 F.2d 813, 819 (9th Cir. 1990), which confirms that the Act applies not only to the designated Wild and Scenic River corridor but also to lands bordering and adjacent to it, where extensive logging is planned and will degrade Wild and Scenic values.

Defendants' legal violations justify entry of injunctive relief, as do the irreparable harms threatened to the soils, fisheries, and aesthetic and scenic values of the Wild and Scenic Rivers. Accordingly, the Court should grant an injunction to temporarily delay the Project until Plaintiffs' challenges can be resolved on the merits.

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 1

## REPLY ARGUMENT

### I. DEFENDANTS CONTRIVE WATERSHED BENEFITS TO JUSTIFY SALVAGE LOGGING.

#### A. The Road Decommissioning Benefits Are Unproven And Illusory.

The FEIS identified the other purpose and need of the Project – besides salvage logging to support local economies – as to "reduce potential sediment inputs into the aquatic ecosystem from decommissioning approximately 20 miles of roads."  FEIS, p. 11.

Given the importance of road decommissioning to the Project's purpose and alleged benefits, one would expect the FEIS to document the extent of the sedimentation problems being caused by these roads, and how decommissioning would improve them. To the contrary, the FEIS ducked these questions.  Careful reading is required to realize that the majority of roads to be decommissioned do not present sediment problems, and the Forest Service is planning to use "natural recovery" – *i.e.*, doing nothing – to claim watershed improvements from their "decommissioning."

According to the ROD, 20.2 miles of "currently existing non-system roads" and 1.1 miles of existing system roads are to be decommissioned.  ROD, p. 6 (FS1903).  As explained in the FEIS Appendix F, Roads Analysis (FS1690-96):

> Non-system roads are not part of the inventoried Forest Service road system and are not maintained to any standard. These roads were identified through imagery (LiDAR) and ground surveys. <u>Non-system roads are not open to public access and are typically grown over with trees and inaccessible</u>.

FEIS, p. 418 (FS1691) (emphasis added).  Record photos illustrate that these roads are indeed heavily overgrown with trees and brush, *see* FS 10E_0121_0178; and staff notes confirm they are mostly "only accessible by walking."  FS7108-10.

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 2

Not only are the non-system roads already overgrown and unused, but they are not documented to be sources of sedimentation either. The FEIS admitted that the Forest Service has no actual data showing the roads to be sediment problem, stating that "<u>sediment delivery from these road segments was not quantified</u>." FEIS, p. 89 (FS1358) (emphasis added); *id.*, p. 387 (FS1656) (same). Worse, the FEIS did not disclose that a Forest Service hydrologist determined the overgrown and unused roads are <u>not</u> sediment problems. In a November 2014 memo, the Project hydrologist asked:

> How do we want to treat roads that are grown over, inaccessible to motorized vehicles, <u>and not current sediment sources (which is most of the identified segments)</u>[?]

FS17382 (emphasis added). The hydrologist also suggested the answer: leave the roads alone, but claim "natural recovery" benefits from their supposed decommissioning:

> Some of these segments are grown over, hardly recognizable, and may not be worth the investment to recontour, but we may want to consider including them in the decision, and leaving ourselves the option of "natural recovery" or something to that effect as a means of decommissioning. . . .

*Id.* Indeed, the FEIS adopted this option of using "natural recovery" to claim watershed benefits from the alleged road decommissioning, stating: "Where roads are determined by watershed or fisheries personnel to be naturally recovered to a condition of long-term stability, physical decommissioning may not occur." FEIS, p. 89. In that case, the road would be decommissioned by "road abandonment which requires no ground disturbing activities." *Id.*, at 418.

The FEIS and ROD did not specify exactly what decommissioning will occur on each road segment. However, FEIS Table F2 listed the segments and decommissioning "effects," which indicate that the Forest Service does not plan to conduct any work on at least half of the 20 miles of non-system road segments. *See* FS1694-96.

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 3

In short, the Forest Service is planning to use "natural recovery" – *i.e.*, doing nothing – for most of the road "decommissioning" in order to claim watershed benefits. The FEIS and ROD thus falsely convey that these roads are an existing sedimentation problem that will be rectified – a clear violation of NEPA.

### B. The Alleged Road Decommissioning Was Added So The Forest Service Could Claim It Is Meeting Forest Plan Requirements, Which It Is Not.

Why include 20 miles of road "decommissioning" for overgrown tracks that are not even a sedimentation problem? The answer is clear: So that the Forest Service could use the alleged watershed benefits of "decommissioning" to claim compliance with the Forest Plan for its planned logging and road construction, even though the majority of the roads to be decommissioned have no relationship to the fire or Project work.

This is acknowledged in an internal email from a Forest Service fish biologist, who expressed doubts about the Project, but promised to "throw in as much road decom as I can." NMFS917. Moreover, the "Sale Feasibility" section of the FEIS reveals that the cost of the "proposed road decommissioning is planned to be covered using supplemental funding . . . ." FEIS, p. 58 (emphasis added). Thus, the Johnson Bar timber sales will not pay for the road decommissioning costs; and the decommissioning is unrelated to the Project.[1]

The Forest Service had to rely on this unrelated road decommissioning to allege compliance with Forest Plan fisheries standards, which require it to "[r]estore presently degraded fish habitat to meet the fish/water quality objectives established in this Forest

---

[1] As illustrated on Project maps, most of the alleged road decommissioning is occurring far from the logging or the burned areas. *See* Shumaker Decl., filed herewith, Ex. 1 (highlighted Project map showing roads to be decommissioned). Although the fire burned 13,000 acres, the Project boundary encompasses 28,000 acres just so these remote overgrown "roads" could be included for their alleged decommissioning benefits.

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 4

Plan (see Appendix A of the Forest Plan)" and "[m]eet established fishery/water quality objectives for all prescription watersheds as shown in Appendix A." *See* FS18676-77. Appendix A to the Forest Plan (FS18828-34) identifies streams that "are below carrying capacity," and specifies that "[t]imber management activities can occur in these drainages, concurrent with habitat improvement efforts, <u>as long as habitat capacity shows a positive, upward trend</u>." FS18834, note 1 (emphasis added).

As the FEIS acknowledged, the streams in the Johnson Bar Project area do <u>not</u> meet the fisheries/water quality standards of Appendix A. *See* FEIS, pp. 97. *See also id.*, pp. 102-03, 110-12 & Appendix D (further discussion of data on stream conditions and requirement of upward improving trend). The Project is thus prohibited under the Forest Plan, unless the Forest Service can demonstrate an "upward improving trend" in the affected watersheds. *Id.*

The alleged road decommissioning "benefits" were essential to the Forest Service's attempt to make that showing, as the FEIS repeatedly acknowledged. *See* FEIS, p. 98 ("This project would comply with these [Forest Plan] directions through the implementation of design criteria and road improvement and decommissioning activities"); p. 121 (showing "measurable positive effects" on surface erosion, stream habitat, and drainage network from road decommissioning); p. 125 ("positive significant [cumulative effects], with long-term watershed benefits" from decommissioning); p. 387 (asserting that decommissioning "will eliminate these existing or potential chronic sediment sources from the landscape").

Yet these claimed benefits are illusory, as shown above. Moreover, the FEIS revealed that Project watersheds remain below Forest Plan standards, confirming there is

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 5

no actual improving trend, even with the claimed benefits of road decommissioning. *See* FEIS, pp. 110-12 & Table 3-19 (existing cobble embeddedness exceeds standards). Therefore, the Forest Service violated the Forest Plan by approving the Project; and it violated NEPA by pretending the road decommissioning is a necessary part of the Project and improves watershed conditions.

### C. Erosion Impacts Will Likely Be Much Greater Than Asserted.

Moreover, the Forest Service's "upward trend" analysis assumes that Project logging and road construction will <u>not</u> increase sedimentation either. The Forest Service relies on its design features and the WEPP model to claim it has "minimized" risk of increased sedimentation coming off the steep slopes to be logged, while dismissing science cited by Plaintiffs and the Tribe showing the opposite – that post-fire logging aggravates erosion after fires by disturbing sensitive soils and removing vegetative cover.

In response to Dr. Pierce's declaration (*Docket No. 14-2*), Forest Service hydrologist Ms. Lloyd spends 20 pages explaining why the WEPP model was better suited than the GRAIP model; and how the Project sought to avoid landslide-prone areas in light of the 1990s storms and mass wasting events, which she admits were highly important. *See Docket No. 30.* Of course, the FEIS presented no such discussion of the 1990s or prior landslide events, and never mentioned the GRAIP model – underscoring that the FEIS was inadequate under NEPA, because it failed to include such discussion.

Plaintiffs do not suggest the Court should decide whether the WEPP or GRAIP model was more appropriate to use here. Instead, they ask the Court to determine whether the FEIS and ROD candidly addressed the sedimentation risks posed by the

Project, in light of the available science. The only answer is: they did not. Numerous reasons support this conclusion, including the following:

    1.    <u>Climate Change Impacts</u>: The FEIS acknowledged that climate change may affect vegetation conditions in the future. *See* FEIS, pp. 199-200. But it ignored a key effect of climate change, identified by Dr. Pierce: increased frequency and intensity of storm events that are the primary causes of mass erosion events in the Clearwater Basin. *See* Pierce Decl., ¶ 26-27. Notably, Forest hydrologist Ms. Lloyd agrees with Dr. Pierce on the importance of these storm events, so failing to address their likely increased frequency in the FEIS undermines its conclusions.

    2.    <u>Model Error In Erosion Projections</u>: Sedimentation risks are not only associated with landslides, but also with erosion from soil disturbance caused by post-fire salvage logging and road activities. The FEIS acknowledged that use of logging equipment and road construction causes soil disturbance that triggers erosion and sedimentation. *See* FEIS, pp. 74, 84-90, 120. It claimed that Project design features – using skyline or helicopter logging on steeper slopes, while leaving slash and debris on the ground – will "minimize" this erosion; and that the WEPP modeling supports that conclusion. *Id.*

But the FEIS conceded that "[a]ccurately predicting erosion is difficult and subject to large errors," and "the average erosion value produced by a model is likely to be plus or minus 50% of the observed value." FEIS, p. 74. The Forest Service thus may be off by 50%, *i.e.*, sedimentation could be far greater than projected. Yet the ROD pays no heed to these risks, asserting that "the data in the FEIS indicate the project will improve sediment and temperature conditions over the long run." ROD, p. 27.

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 7

3. <u>Ash Cap Soils</u>: The FEIS acknowledged that "ash cap" soils – from ash deposited after the eruption of Mount Mazama over 7,000 years ago – are a unique feature of the Project area with exceptional value, but are highly sensitive to erosion from management activities. FEIS, p. 164. The FEIS underscored their vulnerability, stating:

> irreversible damage to soils in the project area could result from the loss of these volcanic soils through erosion or removal by excavation for temporary roads and/or skid trails.

*Id. &* p. 173 (similar). Yet the FEIS provided no indication that the WEPP modeling took into account this unique feature of the Project's soils and their high risk of erosion, again undermining the accuracy of the FEIS and ROD in asserting that the Project poses minimal erosion and sedimentation risks.

4. <u>State/Private Land Logging</u>: The FEIS's projections of minimal sedimentation risks also failed to address the cumulative effects of the Project with recent state and private land logging after the Johnson Bar fire. The "updated" FEIS acknowledged this logging poses cumulative adverse impacts to fisheries and water quality, along with the 2015 fires. *See* FEIS, pp. 124-26. Yet those cumulative effects were not considered in the "Upward Trend" analysis for compliance with Forest Plan fisheries standards (FEIS Appendix D), and again show that Project watersheds are not, in fact, in an upward trend as required by the Forest Plan before the Project may proceed.

5. <u>Contrary Science</u>: Because Plaintiffs, the Tribe, and others provided extensive science showing that post-fire salvage logging causes numerous adverse environmental impacts, including sedimentation, while undermining forest recovery and forest health, the Objection Reviewing Officer ordered the Forest Service to include a section in the "updated" FEIS addressing "Responses to Opposing Science." *See* FEIS,

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 8

Appendix K (pp. 433-38). This document illustrates the one-sided analysis that permeates the FEIS and ROD – and Defendants' injunction declarations – and reveals their bias for logging at the expense of environmental values. Appendix K does not rebut the extensive science about adverse impacts of salvage logging; it just belittles that science. For example, well-known 1995 and 2004 reports from leading scientists (Beschta *et al.*) are dismissed as "opinion or editorial pieces." *Id.*, pp. 434-35. Similarly brushed aside is a 2013 letter signed by 250 scientists, reiterating recent science on harms caused by post-fire salvage logging (FS3539), to which the Forest Service simply said that its FEIS "analyzed direct, indirect, and cumulative effects as a result of the four alternatives." *Id.*

NEPA's "hard look" must be taken "objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made," and the EIS must include a "discussion of adverse impacts that does not improperly minimize negative side effects." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2010). The Johnson Bar Project FEIS repeatedly violates those core NEPA commands, warranting injunctive relief.

## II. WILD AND SCENIC RIVERS ACT VIOLATIONS.

Defendants wrongly argue that the Ninth Circuit foreclosed Plaintiffs' claim under Section 3(d) of the Wild and Scenic Rivers Act in *Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 819 (9th Cir. 1990). Their quotation from *Tyrrel* omitted a key passage from the opinion, which stated that the river there (South Fork Trinity) was designated Wild and Scenic by the <u>Secretary of Interior</u>. That fact was central to the holding in *Tyrrel*: because the South Fork was not Congressionally-designated, no river management plan was required at that time under the prior version of Section 3 (before the 1986

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 9

amendments).  See 918 F.3d at 814-16.   Here, of course, the Selway, Lochsa and Middle Fork Clearwater Rivers were all designated by Congress; and the updated language of Section 3(d) from the 1986 amendments, cited in Plaintiffs' opening brief, applies and must be enforced here.  Indeed, after *Tyrrel*, the Ninth Circuit has enjoined the implementation of government projects because they relied on an invalid river plan.  *Friends of Yosemite Valley v. Norton*, 366 F.3d 731 (9th Cir. 2004).

Moreover, *Tyrrel* confirms that Section 10(a) of the Act – which requires the Forest Service to "protect and enhance" the Wild and Scenic Rivers, and place a "primary emphasis" on preserving their "esthetic, scenic, historic, archeological, and scientific features," 16 U.S.C. § 1281(a) – applies not only to lands <u>within</u> the designated river corridor, but also <u>bordering and adjacent</u> lands pursuant to Section 12(a), 16 U.S.C. § 1283(a).  At issue in *Tyrrel* was a similar challenge to a salvage logging project on Forest Service lands bordering and adjacent to the river corridor.  Sections 10(a) and 12(a) applied to the salvage logging, as *Tyrrel* explained:

> Section 12 of the Act directs the federal agency with jurisdiction "over any lands which include, border upon, or are adjacent to, any river included within the National Wild and Scenic Rivers System" take action "to protect such rivers in accordance with the purposes of [the Act]." 16 U.S.C. Sec. 1283(a). The land at issue in this case is either within or adjacent to the South Fork river system. The proposed sale of timber, whether conducted on land within the river area's boundaries or adjacent to the river area, will impact protected values. Thus, we proceed to address the obligations of the Forest Service under the Wild and Scenic Rivers Act.

*Id.*, at 819-20.

Like the FEIS and ROD, Defendants' briefing fails to acknowledge the impacts of the extensive logging slated for Forest Service lands bordering and adjacent to the Wild and Scenic River corridor.  See Shumaker Decl., Ex. 2 (highlighted Project maps showing logging units within, bordering and adjacent to corridor).  The FEIS and ROD never even

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 10

mentioned Section 12(a), demonstrating that the Forest has "entirely failed to consider an important aspect of the problem" in violation of the APA. *O'Keefe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F. 3d 940, 942 (9th Cir. 1996). And by elevating salvage logging for maximum economic benefits at the expense of Wild and Scenic River values, the FEIS and ROD violate both Sections 10(a) and 12(a).

Additionally, the Forest Service violated NEPA by failing to assess cumulative impacts of the Project on visual, aesthetic, and recreational values in connection with the recent private and state land logging, or salvage logging that is now being proposed after the 2015 wildfires along the Selway River. *See* Lewis, Macfarlane Declarations. FEIS Table 3-0 listed the state and private land logging as related projects, *see* FEIS, p. 50, but the FEIS and ROD never admitted that the Forest Service approved this logging based on its scenic easements on the private properties, and without any public notice or NEPA review. Moreover, the FEIS discussion of the Project's visual impacts was prepared <u>before</u> this private and state land logging occurred, and wholly failed to address it, even in the discussion of cumulative effects. *See* FEIS, pp. 215-31.

The failure to address cumulative effects of the private and state logging with Project impacts on visual, aesthetic, and recreational values protected by the Wild and Scenic Rivers Act obviously violates NEPA. And since it occurred so recently, this logging underscores why a Supplemental EIS should have been released for public comment, before a decision was made.[2]

---

[2] The October 2015 memo addressing whether the 2015 fires changed conditions (FS662-68) likewise did not consider the private and state land logging cumulative impacts. And by limiting its analysis to the narrow physical overlap between areas burned in the Johnson Bar and 2015 fires, the memo failed to address the big picture of how the 2015 fires – which were larger and burned more severely than Johnson Bar – pose sediment and other cumulative impacts. Accordingly, a Supplemental EIS was required.

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 11

### III.   INJUNCTIVE RELIEF IS WARRANTED.

The Forest Service's lead declarant, District Ranger Joe Hudson, insists that an injunction will spell doom for the forest and local communities, including because (a) the burned timber will rapidly lose value, so it has to be logged immediately; (b) post-fire and watershed restoration efforts will be too expensive if the logging does not occur; (c) the burned areas are at high risk of re-burn, if not logged; and, perhaps most remarkably, (d) logging is needed to protect elk hunters from falling dead trees.  *See Docket Nos. 34-35*.  Regional Budget Coordinator Niccolucci goes even further, claiming that this sale is needed to maintain the resilience of local mills and communities –returning to desired levels of the 1970's-1990's, when forest logging volume was far higher and caused severe ecological impacts. *See Docket No. 31*.  These declarations vastly exaggerate the claimed harms, while ignoring contrary science and the FEIS itself.[3]

First, the argument that logging has to proceed immediately to realize timber value is weak, at best, in light of the facts that (a) the Forest Service did not finalize the Project until February 2016, and cannot blame Plaintiffs for its own delay; (b) much of the timber to be logged is cedar, which is twice as valuable as the other species but does not lose value quickly (FS2335), and (c) Plaintiffs' challenges can be rapidly adjudicated

---

[3] Defendants' brief (fn. 5) objects to Plaintiffs' declarations, but the Court may properly consider them to show Article III standing and irreparable harm, *Northwest Envtl. Defense Ctr. v. BPA*, 117 F.3d 1520, 1527 (9th Cir. 1997); and to "determine whether the agency has considered all relevant factors and explained its decision," *Earth Island Inst. v. USFS*, 442 F.3d 1147, 1162 (9th Cir. 2006); *Nat'l Audubon Soc. v. USFS*, 46 F.3d 1437, 1147 (9th Cir. 1993).

Defendants, however, cannot prop up their FEIS and ROD by *post hoc* declarations that raise new explanations.  *Motor Vehicle Mfrs. Ass'n v. State Farm,* 463 U.S. 29, 50 (1983); *Humane Soc'y of the United States v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010).  And they do not justify filing the "Idaho County" declaration (*Docket No. 33*), when a county is not a competent "person" to submit a declaration under 28 U.S.C. § 1746.

on the merits, meaning that any injunction will be short-lived.

As for impacts on local mills and communities, the Forest Service declarants ignore their own FEIS, which explains that local mills have plenty of other salvage as well as green timber. *See* FEIS, pp. 60-61. Specifically:

> The State of Idaho and private individuals have plans to harvest trees in 2015 and 2016 on lands that burned, which would also contribute approximately 60 mmbf to timber flow in the area, in addition to the annual State and private timber outputs. . . To avoid having a flooded market of timber, the mills are switching from logging green timber to fire salvage trees from Forest Service, State, and private lands in an effort to supply the mills with the deteriorating fire killed trees and saving the green volume to supply the mills once the dead volume has all been processed.

*Id.*, p. 60 (FS1329). Further, as acknowledged in Defendants' brief, "the communities tend to be more resilient than assumed and are diversifying." *Docket No. 29,* p. 26, n. 16.

Regarding restoration, the Forest Service declarants fail to address the fact that the post-fire "Burned Area Emergency Recovery" (BAER) program is the vehicle for conducting post-fire treatments. They also assume that road decommissioning under the Project will be beneficial, without addressing the fact that most of the "decommissioning is "natural recovery" anyway, so that will obviously continue even with an injunction.

Regarding the "re-burn" theory, Hudson's declaration is based on his personal anecdotal observations of recent fire behavior, while ignoring contrary facts and science. The FEIS indicates that past harvesting had no apparent effect on the Johnson Bar wildfire behavior – units that were previously logged often saw intense fire activity, while many previously unharvested units burned little or not at all. *See* FEIS, pp. 168-69. And the assertion that a burned area must be salvage logged in order to prevent future intense fires has received scientific criticism – as the FEIS acknowledged: "There is conflicting science with regards to subsequent fire severity." *See* FEIS, pp. 464-65.

PLAINTIFFS' REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION -- 13

In contrast to these overblown claims of harm from an injunction, delaying the Project's logging and road construction for the short period until Plaintiffs' claims are resolved on the merits is vitally needed to protect the Wild and Scenic values of the Selway and Middle Fork Clearwater Rivers, their fisheries and water quality, the sensitive ash cap soils, and other ecological and human values.  The Court should weigh closely the recent 250 scientists' letter, which emphasized:

> [C]onsider what science is telling us: post-fire habitats created by fire, including patches of severe fire, are ecological treasures rather than ecological catastrophes, and that post-fire logging does far more harm than good to the nation's public lands.  (FS3539).

## CONCLUSION

For the foregoing reasons and those previously briefed, the Court should grant Plaintiffs' motion for preliminary injunction.

DATED: April 22, 2016.            Respectfully submitted,

/s/ Laird J. Lucas
Laurence ("Laird") J. Lucas (ISB 4733)
Marc Shumaker (ISB #9606)
Advocates for the West

Deborah A. Ferguson (ISB# 5333)
Ferguson Durham, PLCC

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

   I hereby certify that on this 22nd day of April, 2016, I caused the foregoing PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION to be electronically filed with the Clerk of the Court using the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Counsel for Federal Defendants
Julia A. Thrower
U.S. Department of Justice
301 Howard Street, Ste. 1050
San Francisco, CA 94105
julie.thrower@usdoj.gov

Sean C. Duffy
United States Department of Justice
Environment & Natural Resources Division
Washington, DC 20044
sean.c.duffy@usdoj.gov

Rickey Doyle Turner, Jr.
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Denver, CO 80202
rickey.turner@usdoj.gov

Counsel for Proposed Intervenors
Paul A. Turcke
Cherese D. McLain
MSBT Law
950 W. Bannock St., Suite 520
Boise ID 83702
pat@msbtlaw.com
cdm@msbtlaw.com

Lawson E. Fite
American Forest Resource Council
510 S.W. Macadam, Suite 350
Portland OR 97239
lfite@amforest.org

                  /s/ Laird J. Lucas